THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM YOUNG, Defendant-Appellant.

Second District   No. 2—90—0046

Opinion filed October 21, 1991.

G. Joseph Weller and Paul J. Glaser, both of State Appellate Defender's Office, of Elgin, Kathleen T. Zellner & Associates, of Naperville, and James

P. Palermini, of Huck, Bouma, Martin, Charlton & Zellner, of Glen Ellyn, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers and David A. Bernhard, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE WOODWARD delivered the opinion of the court:

Defendant, William Young, was indicted on one count of armed violence (Ill. Rev. Stat. 1987, ch. 38, par. 33A—2), one count of intimidation (Ill. Rev. Stat. 1987, ch. 38, par. 12—6(a)(1)) and one count of unlawful use of weapons (Ill. Rev. Stat. 1987, ch. 38, par. 24—1(a)(7)). The circuit court found him unfit to stand trial (Ill. Rev. Stat. 1987, ch. 38, par. 104—10 *et seq.*), and defendant appealed. This court affirmed the finding of unfitness. (*People v. Young* (2d Dist. 1990), No. 89—0114 (unpublished order under Supreme Court Rule 23).) The circuit court then held a discharge hearing (Ill. Rev. Stat. 1989, ch. 38, par. 104—25) and found that the evidence was sufficient to convict defendant of the aforementioned charges. Defendant appeals from this finding, arguing (1) the court deprived him of his constitutional right to represent himself at the discharge hearing and (2) his trial counsel was ineffective in not raising an insanity defense to the charges. We reverse and remand.

The charges against defendant were based on his conduct on the morning of October 18, 1988, toward his ex-wife and his son, with whom he was living at that time. On November 7, 1988, defendant appeared before Judge Raymond McKoski for a hearing on defendant's motion to dismiss the public defender as his counsel. The judge questioned defendant to determine whether defendant's waiver of counsel was knowing and voluntary; defendant invoked his right of silence in response to the questioning. Judge McKoski denied the motion (and defendant's motion for a change of venue to Biloxi, Mississippi) and ordered that defendant be examined by Dr. Alfred Marx, a psychologist for the Lake County Mental Health Department, to ascertain his fitness to stand trial. Dr. Marx interviewed defendant on November 18, 1988, and also examined the police reports of the events of October 18, 1988.

On December 9, 1988, Judge William Block, now presiding over the trial, found that Dr. Marx's report raised a *bona fide* doubt of defendant's fitness to stand trial. He ordered defendant to be examined by Dr. Ronald Baron, a psychiatrist. Dr. Baron interviewed defendant on January 12, 1989. Dr. Baron also reviewed police re-

ports and statements given by defendant's wife and son, contacted a psychiatrist who had formerly seen defendant infrequently for medication only, and spoke to the assistant public defender who represented defendant throughout the proceedings at the trial level.

When Dr. Marx told defendant the purpose of his examination, defendant replied that he wished to remain silent. According to Dr. Marx:

> "[Defendant's] decision to remain silent is based on the 'overriding fact' that he is the central figure in a thirty million dollar civil law suit (starting four years ago) having to do with an injured worker and 'insurance company fraud,' involving falsified documents, the F.B.I., and the U.S. Attorney General. He chose not to elaborate regarding this suit."

Defendant refused to talk about the offenses with which he was charged and said that his actions were a "non-issue."

Dr. Marx concluded that despite defendant's "high average intelligence" and good understanding of legal proceedings, defendant's unwillingness to discuss the events leading up to his arrest precluded a definitive finding of whether he was fit to stand trial. Dr. Marx added, however, that the reports of the alleged offense, defendant's subsequent behavior and the fitness examination were "highly suggestive of a significant psychiatric disorder which might impair his ability to participate rationally and effectively in his own defense." According to Dr. Marx, it was to be doubted whether defendant's "observations and considerations [were] adequately reality oriented. *** [T]here is the distinct possibility that his reasoning and judgment may be based on unrealistic premises, distortions of reality, and/or delusional thinking."

When Dr. Baron attempted to interview defendant, defendant handed him a note stating that defendant wished to remain silent and that there was a conspiracy against him by Sara Lee Bakeries, where he had worked, and others. Dr. Baron reported that the psychiatrist who had formerly seen defendant for medication only remembered defendant only as "uncooperative and a typical paranoid." The assistant public defender representing defendant told Dr. Baron that he was limited by defendant's refusal to talk or let him talk. Dr. Baron concluded that defendant was unfit to stand trial. He wrote:

> "While I appreciate the difficulty [Dr. Marx] had in substantiating his hunch, I believe there is ample evidence that [defendant] suffers from a paranoid reaction which significantly interferes with his judgment and his ability to participate rationally in his own defense. *** The further delineation of his disease will

have to await securing the hospital records and getting a more adequate history from either the defendant or his family. *** Mr. Young certainly [has] a past history of psychiatric disorder that transcends the immediate offense with which he is charged. His actions in the offense are more in line with a person suffering from persecutory delusions than a rational man."

On January 26, 1989, the trial court, after a brief hearing at which defendant presented no evidence to rebut the expert reports, entered an order finding defendant unfit to stand trial and placing defendant with the Elgin Mental Health Center. Defendant appealed from the order.

While the appeal was pending, the court received a "progress report" on defendant from the Elgin Mental Health Center. The report, by Dr. Ofelia G. Endrinal, was dated June 28, 1989, filed July 13, 1989, and based on a June 15, 1989, fitness evaluation.

Dr. Endrinal concluded that, based on her clinical interview with defendant, her consultation with defendant's caseworker and treatment team, the police reports and available records, defendant remained unfit to stand trial.

Dr. Endrinal's report stated that, according to hospital records, this was defendant's first admission to an Illinois Department of Mental Health and Developmental Disabilities facility, and there was no indication that he had received inpatient private psychiatric treatment. Defendant had attended outpatient sessions at River Edge Hospital. No other information on defendant's treatment history was available at the time, and defendant refused to provide any.

Defendant refused to discuss the incident leading to his arrest. His conduct, in Dr. Endrinal's view, was highly suggestive of a "significant paranoid delusional disorder."

On September 18, 1989, per court order, Dr. Endrinal reported that, in her opinion, defendant would not be fit to stand trial within one year of the original finding of unfitness. Dr. Endrinal explained that she had relied on the June 15, 1989, examination (as defendant refused to be interviewed for a "90-day fitness re-evaluation" on September 12, 1989), pertinent records, and consultation with defendant's caseworker and the unit psychiatrist. Dr. Endrinal concluded that not only would defendant be unable to participate rationally and effectively in his own defense, but that his mental condition had deteriorated since admission. He was increasingly paranoid and resistant to treatment and continued to be "highly delusional, confused, irrelevant, and illogical."

Late in September 1989, defendant wrote to G. Joseph Weller of the Office of the State Appellate Defender. He sent copies of the letter to Judge Block, among others. The letter, dated September 27, 1989, reads:

"Dear Mr. Weller:

As indicated in my numerous memos dating back to March, 1989 *I am acting as my own attorney* and *will not be denied that right,* and therefore reject Mr. Glaser [defendant's appellate counsel] as attorney.

Furthermore, *I will present* at the oral argument proof that the psych report and the court records are false. Judge Block will be perjuring himself if he stated otherwise.

Mr. Glaser may keep me informed as required, *but he is not my attorney.*

You have ignored my memos for too long, you cannot ignore *attempted murder charges* which I will also present.

In the meantime I still consider myself illegally detained here at EMHC.

Sincerely,

William H. Young"

Judge Block, uncertain what this letter meant, gave the assistant State's Attorney and defendant's trial counsel each a copy and continued the case. On January 8, 1990, two days before this court filed its order affirming the original finding of unfitness, the circuit court held the discharge hearing (Ill. Rev. Stat. 1989, ch. 38, par. 104—25).

Defendant was present at the hearing and was represented by counsel. He asserted no desire to represent himself. Against the advice of the court and counsel, defendant made a statement before trial, which, in its entirety, went (as transcribed) "This court stinks of itnagy. Thank you."

The prosecution's principal witnesses were Linda Young, defendant's ex-wife, and Richard Young, his son. Linda Young testified that on October 19, 1988, she was living at 2325 Federal Parkway in Lindenhurst with defendant, from whom she had been divorced in March of that year, and their 18-year-old son, Richard. Each family member had a separate room. Early that morning, she woke up and noticed that the electricity was off. She went downstairs and saw that defendant was sitting at the kitchen table. He was holding a shotgun and a pistol. She screamed; he ordered her to sit at the table across from him. She did so. He demanded that she write out a confession. She did not understand; he stated that she had killed his mother. She

asked him what he meant by that; he referred to accusations that she and Judge Wysocki had made against his mother. She asked defendant what happened to his mother, and he replied that his mother was "not dead" or was "all right."

Richard Young heard Linda Young screaming and came downstairs. Defendant ordered Richard to sit on the floor and told Linda Young to start writing her confession or he would start shooting her fingers off. She started writing. The guns were on the table, pointed at Linda Young; at some time, defendant pointed a gun at Richard. Eventually, Richard Young sprung at defendant and pushed him against the wall. Linda Young ran next door and Richard Young followed; their next-door neighbor called the police.

On cross-examination, Linda Young stated that she had been married to defendant 23 years. In that time, he had twice committed himself to a mental institution, once early in the 1970s and once in 1982 or 1983. She characterized defendant's actions of October 19, 1989, as a nervous breakdown; she had seen defendant have nervous breakdowns before, but never that extreme. When she wrote the "confession," it was because defendant was threatening her with the gun that he was holding.

Richard Young testified that early in the morning of October 19, 1989, he woke up to his mother's screaming and went downstairs to find that she was seated at the kitchen table across from defendant, who had a shotgun and a pistol. Defendant ordered Richard to kneel on the floor, and Richard did so. Defendant was pointing a gun at Linda Young and ordering her to confess to something. Richard ran out of the room; defendant pointed the shotgun at Linda Young and told Richard that he would kill her if Richard did not come back in. Defendant also attempted to fire the gun. At one point defendant put the shotgun down, and Richard ran toward him; the two struggled for the gun, and Richard eventually pushed defendant away and ran outside to join Linda Young.

On cross-examination, Richard stated that he was not sure if he would characterize defendant's actions as a nervous breakdown, although he knew that defendant had had a nervous breakdown earlier. Richard had felt threatened because defendant was armed at the time defendant made his threats.

Three Lindenhurst police officers testified to the circumstances of defendant's apprehension and arrest. Defendant complied with the officers' demands that he exit the house unarmed. The trial court sustained a prosecution objection when defendant's attorney asked one officer whether defendant was "acting crazy" when arrested.

The defense put on no witnesses. Defendant's attorney moved for a finding of acquittal at the close of the State's evidence. Defendant's attorney argued only that defendant should be acquitted of the armed violence charge. His argument was that because the intimidation charge depended on the use of the shotgun, the armed violence charge was an impermissible attempt to enhance defendant's actions to a Class X felony, as the armed violence charge rested on the same use of the shotgun. The trial court denied defendant's motion.

Aside from a handful of questions on cross-examination, all noted above, defendant's attorney never argued or suggested that defendant should be found not guilty by reason of insanity.

The court found that the State's evidence was sufficient to prove defendant guilty beyond a reasonable doubt of the offenses charged. On January 8, 1990, the court entered an order to that effect. The order remanded defendant to the Department of Mental Health and Developmental Disabilities for a period not to exceed two years, the maximum allowed by statute (see Ill. Rev. Stat. 1989, ch. 38, par. 104—25(d)(1)). This appeal followed.

We note initially that although defendant's appellate brief states that he was "found guilty" at the discharge hearing, a discharge hearing is an "innocent only" proceeding to test the sufficiency of the State's evidence; although a defendant may be acquitted, a technical determination of guilt is deferred until the defendant is fit to stand trial. (*People v. Rink* (1983), 97 Ill. 2d 533, 543; *People v. Burt* (1986), 142 Ill. App. 3d 833, 835.) Where the court has found that it is not substantially probable that a defendant will become fit to stand trial within one year of an adjudication of unfitness, the defendant may move for a discharge hearing. Ill. Rev. Stat. 1989, ch. 38, par. 104—23(a); *People v. Quay* (1988), 175 Ill. App. 3d 965, 967.

At a discharge hearing, the trial court may make one of three dispositions. First, it may find that the State has carried its burden of proof. It may then remand the defendant for treatment for a period not to exceed, for a Class X or Class 1 felony, a period of two years from the expiration of the original one-year treatment period. (Ill. Rev. Stat. 1989, ch. 38, par. 104—25(d)(1); *People v. Burton* (1988), 166 Ill. App. 3d 143, 145-46.) At the end of this period, the court may proceed with trial if the defendant is fit or can be rendered fit with special provisions or assistance (Ill. Rev. Stat. 1989, ch. 38, par. 104—25(g)(1)); otherwise, the court must determine whether the defendant is subject to involuntary admission under the Mental Health and Developmental Disabilities Code (Ill. Rev. Stat. 1989, ch. 91½, par. 1—100 *et seq.*) or constitutes a serious threat to the public safety. If so,

the defendant shall be treated similarly to a civilly committed patient; if not, the defendant shall be released (Ill. Rev. Stat. 1989, ch. 38, pars. 104—25(g)(1), (g)(2)).

Second, the court may enter a judgment of acquittal based on a finding that the defendant is not guilty by reason of insanity (Ill. Rev. Stat. 1989, ch. 38, par. 104—25(c)), after which the court must determine, pursuant to section 5—2—4 of the Unified Code of Corrections (Ill. Rev. Stat. 1989, ch. 38, par. 1005—2—4), whether the defendant is subject to involuntary admission or in need of mental health services (Ill. Rev. Stat. 1989, ch. 38, par. 104—25(c)). Third, the court may enter a judgment of acquittal not based on a finding of insanity, in which event it may still commit the defendant pursuant to the provisions of the Mental Health and Developmental Disabilities Code (Ill. Rev. Stat. 1989, ch. 38, par. 104—25(b)).

Here the court's finding of unfitness was embodied in its order of January 26, 1989. As the court imposed the maximum term at the discharge hearing, the defendant's extended term of commitment will expire (and may not run past) January 26, 1992. However, even where the term of treatment expires before the completion of appellate review, an appeal from an order of commitment at a discharge hearing ordinarily will not be considered moot. *Yiadom v. Kiley* (1990), 204 Ill. App. 3d 418, 424-25.

With these clarifying principles in mind, we move to defendant's contentions on appeal. Defendant argues first that the trial court violated his constitutional right to waive counsel and appear *pro se* at the discharge hearing. Defendant construes the letter of September 27, 1989, to G. Joseph Weller as a request that he be allowed to represent himself. He argues that the trial court should have responded to this letter by ascertaining whether defendant was fit to waive his right to counsel and that the trial court's failure to do so violated defendant's right to self-representation.

■ Defendant is correct that the constitutional right to counsel implies a constitutional right to self-representation and that a defendant may waive counsel if such an election is a knowing and intelligent relinquishment of a known right. (*People v. Silagy* (1984), 101 Ill. 2d 147, 179-80; *People v. Davis* (1988), 169 Ill. App. 3d 1, 6.) Otherwise, defendant's argument is meritless and based on a misreading of the record. As the record indicates, Judge McKoski originally found that defendant lacked the capacity to waive the right to self-representation. Defendant never appealed this finding. Defendant's letter of September 27, 1989, obviously represents his desire to represent himself on his appeal from the finding of unfitness. Defendant never

asked to be allowed to represent himself at the discharge hearing and acquiesced in the appointment of an assistant public defender to represent him. Thus, it is understandable that the trial court did not inquire into defendant's ability to waive the right to counsel; the court had already addressed that issue and decided it unfavorably to defendant, and defendant did not again contest that finding.

In any event, the failure to reopen the inquiry would not have been error. A trial court must carefully scrutinize an asserted waiver of the right to counsel and must determine for itself whether the defendant has the requisite capacity to make an intelligent and knowing waiver. The court must consider various factors including the defendant's mental capacity. (*People v. Kessler* (1983), 113 Ill. App. 3d 354, 359.) A defendant who is so mentally ill that he is not fit to stand trial is not likely to have the minimal mental capacity to proceed *pro se*. Lacking this minimum capacity, he need not and should not be allowed to represent himself even if he wants to do so. (*Kessler*, 113 Ill. App. 3d at 362, relying primarily on *Pickens v. State* (1980), 96 Wis. 2d 549, 292 N.W.2d 601.) At the time of the discharge hearing defendant had already been adjudicated unfit to stand trial because of his paranoia and delusional thinking. The court could not reasonably have allowed him to represent himself.

Defendant's second argument is that he was deprived of the effective assistance of counsel because his attorney at the discharge hearing made no attempt to raise the affirmative defense of insanity. Defendant argues that although the record contains much evidence tending to show that he was insane at the time he committed the alleged offenses, his attorney inexplicably failed to introduce any evidence on the issue at the discharge hearing. Defendant also asserts that his trial counsel failed to pursue discovery that would have supplied witnesses to support an insanity defense.

To prevail on a claim of ineffective assistance of counsel, a defendant ordinarily must show that (1) counsel's performance was deficient and (2) this deficient performance prejudiced the defense. (*Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064; *People v. Albanese* (1984), 104 Ill. 2d 504, 525.) To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome; the defendant need not demonstrate that it was more likely than not that counsel's errors actually altered the outcome of the proceeding. (*Strickland*, 466 U.S. at 693-95, 80 L. Ed. 2d at 697-98, 104 S. Ct. at

2068.) Moreover, these principles are guidelines rather than mechanical rules; in each case, the reviewing court must focus on the fundamental fairness of the proceeding and consider "whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Strickland*, 466 U.S. at 696, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

In a narrow range of circumstances, prejudice may be presumed. If defense counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, there is a denial of the right to counsel that makes the adversary process itself presumptively unreliable. (*United States v. Cronic* (1984), 466 U.S. 648, 658-59, 80 L. Ed. 2d 657, 667-68, 104 S. Ct. 2039, 2046-47.) Although defense counsel is not required to create a reasonable defense where none exists, a defendant has the right to require his counsel to subject the prosecution's case to a meaningful test. (*Cronic*, 466 U.S. at 656, 80 L. Ed. 2d at 666, 104 S. Ct. at 2045; *People v. Hattery* (1985), 109 Ill. 2d 449, 461-65.) The guidelines for determining when counsel has been ineffective have been developed primarily in the context of appeals from convictions after criminal trials (or guilty pleas), but we see no reason to apply a different standard to a discharge hearing, where counsel's performance may determine whether a defendant will be exposed to lengthy confinement and the possibility of a criminal trial and conviction thereafter.

■ We conclude that defense counsel here failed to subject the prosecution's case to meaningful adversarial testing and that the result of the discharge hearing must therefore be presumed unreliable. Although courts have characteristically applied the *Strickland/Cronic* presumption of unreliability to criminal trials where defense counsel openly and unequivocally concedes the defendant's guilt against the defendant's wishes (see *Hattery*, 109 Ill. 2d at 462-65 (and cases cited therein)), the Supreme Court's language does not make a formal concession a prerequisite to a presumption of prejudice. Defense counsel's actions (or inaction) in the case at bar were tantamount to such a concession in any event.

At the discharge hearing, defense counsel put on no witnesses and engaged in minimal cross-examination or argument. Such cross-examination and argument as he made, moreover, were almost entirely directed toward his theory that a conviction of armed violence would be an improper double enhancement of an intimidation conviction. This theory is unsound as a matter of law. (*People v. Munson* (1988), 171 Ill. App. 3d 274, 276-77.) It cannot be said that defendant wished to

concede his guilt or even that he was competent to do so. Defense counsel thus did not subject the prosecution's case to meaningful testing.

Had there been no *bona fide* defense, defense counsel would not have been ineffective for not raising one. (*Cronic*, 466 U.S. at 656 n.19, 80 L. Ed. 2d at 666 n.19, 104 S. Ct. at 2045 n.19.) However, the argument that defendant was insane at the time of the alleged offenses was not so lacking in merit as to make it objectively reasonable for defense counsel to forego any meaningful attempt to raise it at the hearing. We are aware that it would have been defendant's burden to show by a preponderance of the evidence that at the time of the alleged offenses, as a result of a mental disease or defect, he lacked substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. (Ill. Rev. Stat. 1987, ch. 38, par. 6—2(a); *People v. Quay* (1988), 175 Ill. App. 3d 965, 968.) We are also aware that unfitness to stand trial is not the equivalent of insanity at the time of the offense. (*People v. Lang* (1979), 76 Ill. 2d 311, 327.) Nonetheless, even on the limited record before us, it does not appear that the failure of defense counsel even to *argue* the defense of insanity was objectively reasonable.

At the time of the discharge hearing, defendant had been examined by a number of experts who unanimously concluded that he was suffering from paranoia and delusional thinking. Dr. Marx interviewed defendant within a month of the acts on which the charges were based, and Dr. Baron interviewed defendant less than two months thereafter. Dr. Baron concluded not only that defendant had a history of psychological disorders, but also that defendant's conduct on October 19, 1988, was "more in line with a person suffering persecutory delusions than a rational man." Indeed, it is hard to imagine why else defendant would have coerced his former wife at gunpoint into signing a "confession" that she killed someone who was not dead. Assuming that there was some reason not to call witnesses on the issue of insanity, it is not clear why defense counsel did not at least attempt to incorporate the evidence already of record in the case.

Defendant argues additionally that the failure to raise an insanity defense at the hearing indicates that defense counsel was ineffective in failing to investigate a possible insanity defense. In several cases, the appellate court has reversed convictions where defense counsel failed to make an adequate investigation into the evidence that would support the insanity defense. *People v. Baldwin* (1989), 185 Ill. App. 3d 1079; *People v. Murphy* (1987), 160 Ill. App. 3d 781; *People v. Howard* (1979), 74 Ill. App. 3d 138.

In the appeal at bar, there was easily accessible evidence of defendant's prior hospitalizations for mental problems. Defendant's ex-wife, under cross-examination by defense counsel, stated that defendant had twice admitted himself to mental institutions, once in the early 1970's and again in either 1982 or 1983. Defendant's son confirmed that his father had been previously hospitalized for a "nervous breakdown." Normally a failure to investigate will not support a claim of ineffective assistance of counsel unless defendant on appeal can show with some specificity what additional evidence his trial counsel could have produced from the investigation. (*People v. Young* (1983), 115 Ill. App. 3d 455.) Here it is evident even a cursory investigation would have discovered evidence relevant to defendant's defense. Therefore, we find this failure to investigate defendant's mental history as a further example of defense counsel's ineffective assistance.

We believe that the fairest resolution is to remand for a new discharge hearing. We note, however, that defendant's term of treatment pursuant to the order from which he has appealed expires three years from the original finding of unfitness. This period is the maximum permissible pursuant to a discharge hearing. (*People v. Burton* (1988), 166 Ill. App. 3d 143, 146.) At the end of this period, therefore, the court must either find defendant fit to stand trial and proceed accordingly or order his commitment according to statute (Ill. Rev. Stat. 1989, ch. 38, pars. 104—25(c), (g)). The disposition will of course depend on the outcome of the new discharge hearing; however, defendant may not be remanded for further treatment (see Ill. Rev. Stat. 1989, ch. 38, par. 104—25(d)) for a term that expires after the statutory maximum of three years from the original finding of unfitness.

The judgment of the circuit court is reversed, and the cause is remanded.

Reversed and remanded.

DUNN and BOWMAN, JJ., concur.