THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. AL-
BERT J. ADAMCYK, Defendant-Appellant.

Second District No. 2—92—1072

Opinion filed March 25, 1994.

Gregory J. Schlesinger, of Schlesinger & Krasny, of Chicago, for
appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and
Marshall M. Stevens, both of State's Attorneys Appellate Prosecutor's Office,
of counsel), for the People.

JUSTICE BOWMAN delivered the opinion of the court:

Defendant, Albert J. Adamcyk, was tried in a bench trial and
convicted of home invasion (Ill. Rev. Stat. 1991, ch. 38, par. 12—
11(a)(2) (now 720 ILCS 5/12—11(a)(2) (West 1992))), residential bur-
glary (Ill. Rev. Stat. 1991, ch. 38, par. 19—3(a) (now 720 ILCS 5/19—
3(a) (West 1992))), unlawful restraint (Ill. Rev. Stat. 1991, ch. 38, par.
10—3(a) (now 720 ILCS 5/10—3(a) (West 1992))), and aggravated

battery (Ill. Rev. Stat. 1991, ch. 38, par. 12—4(b)(2) (now 720 ILCS 5/12—4(b)(2) (West 1992))). The trial court sentenced him to concurrent terms of imprisonment of 18 years, 10 years, 2 years, and 3 years, respectively. Defendant timely appealed his convictions, and he raises the following issues: whether he was denied the effective assistance of counsel because his attorney failed to raise the defense of insanity; and whether his sentence for the home invasion conviction was excessive.

Three months before the trial, the court ordered that a preplea report be done on defendant. The report was filed on April 27, 1992. In the summary of the offense section, the report stated that defendant entered the home of the victim and pulled her out of the shower. He was wearing a nylon stocking over his head. He dragged her from the bathtub to the bedroom, threw her face down on the bed, and made "sexual movements on top of her buttocks which resembled intercourse." Defendant told the victim "that he had been wanting to talk to her for a couple of weeks; however, was afraid of being rejected by her." The victim asked why defendant did not call her, and he responded that he did not have her telephone number. Defendant also said "he was not going to hurt her; however, he had done this before and was on Probation for it." He told the victim he was married and did not want to lose his children. While sitting on top of the victim, he kissed her on the cheek through the stocking. Defendant got off the bed, took off the stocking, and began to cry.

> "[D]efendant told her that he had been unhappily married to an oriental woman for the past 11 years and that he had two children. He indicated he had sex with his wife but there was no emotional fulfillment on his part. Even though he did not feel anything for his wife, he did not want a divorce. He told the [victim] that he could not get anyone to go out with him because he was married. Since no one wanted to date married men, he then had to do what he was doing to her. He added that he hated caucasian women because of that."

Before defendant left the victim's apartment, he told her she could call him "Jim," and he asked for her phone number.

The report set forth defendant's criminal history: in 1982 defendant was convicted of public indecency for masturbating while driving; in 1983 he was convicted of disorderly conduct as a " 'peeping tom' "; in 1985 he again was convicted of disorderly conduct for looking into bedroom windows; in 1988 he jumped into a decorative waterfall fountain at Stratford Square Mall, resulting in a conviction of disorderly conduct; and in 1991 he was convicted of criminal trespass to residence and sentenced to 12 months' probation after he

attempted to remove a screen on an apartment. Defendant attempted suicide at the police station after that arrest. He also was twice convicted of driving under the influence of alcohol.

The preplea report further stated that defendant told the probation officer that as a child he was subjected to physical, psychological, and sexual abuse. Defendant was hospitalized for psychiatric problems regarding "sexual issues." He also reported attempting suicide several times. Defendant was first hospitalized in 1983 or 1984 after he attempted suicide. His diagnosis on discharge was "adjustment disorder with depression and suicidal ideation *** and voyeurism." In 1990, he sought treatment for alcohol problems and was in therapy for a year. Defendant was hospitalized from February 22 to March 3, 1992. Defendant had " 'an extensive past history of sexual abuse and *** a recent history of voyeurism. While incarcerated, he reportedly became increasingly depressed and suicidal.' " Defendant " 'presented with obsessive thinking, anhedonia, sleep and appetite disturbance, feelings of helplessness and hopelessness and depressed mood.' " Defendant was placed on Prozac and Anafronil. The final diagnoses were "Major Depression, Single Episode and Voyeurism." Defendant also was active in Sex Anonymous.

The trial began on June 12, 1992. In his opening statement, defense counsel conceded that the evidence would show that defendant entered the victim's apartment without authority, but counsel asserted that defendant was not guilty of home invasion because defendant did not intend to injure the victim. Counsel also argued that the evidence would show that the victim did not suffer bodily harm and that defendant did not intend to commit criminal sexual assault. Counsel conceded that the State would be able to prove the charge of unlawful restraint.

The victim testified that on the evening of January 29, 1992, she was alone in her apartment. She took a shower and was reaching for a towel when she saw defendant's reflection in the mirror. Defendant had pantyhose over his face, and he was wearing gloves. The victim screamed, and defendant grabbed her in the shower and stuffed her blouse in her mouth to silence her. The victim tried to kick and back away from defendant, and he told her to "shut up." He then dragged the victim out of the shower, and because of the victim's struggling, he banged her into the tub, the toilet, and the vanity. Defendant threw the victim facedown on the bed and straddled her, sitting on top of her buttocks. Defendant pushed her head into a pillow and put his fist in her mouth while he made "thrusting motions" against her. According to the victim, defendant simulated intercourse by rubbing

against her buttocks. She could feel that he had an erection. Defendant also kneed her and kicked her down. He told her, "Shut up. It will feel good. You'll like it," and that she was beautiful and "hot."

When the victim began crying and stopped struggling, defendant asked why she was crying. She said she was scared, and defendant admitted that he was also frightened. Defendant explained that he had "done this before," he did not "want to lose [his] kids," and he knew the victim could get him "in a lot of trouble." The victim further testified:

"I said, well, why are you doing this to me? I have never done anything to you. I don't know you. Why do you want to hurt me?

Q. What did he say?

A. I love you.

He said he didn't want to lose his children. And I kept—during this conversation, when we stopped fighting, I kept trying to turn my head and he still kept turning it away, pushing it into this pillow. He said, I don't want you to see me. And I said, I won't do anything, I swear I won't.

\* \* \*

I said, wouldn't it be better if we knew each other? You don't need to do this to someone."

Defendant then knelt at the side of the bed and removed the stocking from his head. Defendant asked if he could cry, and the victim said he could. Defendant told her about how he was sexually abused as a child and that he "didn't do what [he] came here to do." Defendant also talked about his marriage. The victim asked if he had a weapon, and he told her that he had a knife, but did not show it to her. He also told her that he liked the suit she was wearing that day and he liked the way she dressed. Defendant asked her if she smoked, then allowed her to put on a robe, and they went into the living room.

They each sat on a couch and smoked cigarettes. Defendant said he felt dizzy, so the victim offered him something to drink. She got him a glass of water and a wine cooler for herself. As she searched through her utensil drawer for an opener, defendant remarked that, on several occasions, he had watched the victim cooking. Defendant took off his glove to drink the water. The two returned to the living room and defendant recounted that he had been at a group therapy session that evening and he believed that the sessions were helping because he did not "actually do what [he] came here to do." After a while, defendant indicated that he was going to leave. He told the victim that he wanted to see her again, and she made up a name and phone number and agreed to see him on Saturday night. Defendant then straightened up the apartment and put the glass and his ciga-

rette butts in his pocket. Defendant thanked the victim for "being such a good person about this," and he asked if he could hug and kiss her. She agreed, and he kissed her on the forehead and the mouth. He asked which door he should leave by, and she told him to go out the door he came in. He went to the back door and as he was exiting told her to make certain that she locked the door. He told her he would see her Saturday and then left.

The victim further testified that after she was certain defendant was gone she telephoned a friend and asked that he come over to her apartment. When her friend arrived, he insisted that she call the police, which she did. Because she was bruised and sore and her right hip was swollen, on February 2, 1992, the victim went to a physician for treatment. X rays revealed that the victim did not suffer any broken bones, and the doctor diagnosed only severe contusions.

On cross-examination, the victim admitted that defendant did not fondle her or touch her private areas while he dragged her into the bedroom. Defendant did not punch the victim, and he did not remove any of his clothing or attempt to take off his shirt or unzip his pants. She also admitted that while they were on the bed defendant did not touch her genitals and only touched her breast by sliding his hand underneath her to brace himself. Defense counsel attempted to impeach the victim with her statement to the police that defendant "leaned against" her buttocks and her failure to tell them that defendant touched her breasts. The victim also admitted that she did not tell defendant that he had hurt her, nor did she tell her friend that she had been injured.

Commander Thomas Schrieber, of the Bloomingdale police department, testified that he interviewed defendant about the incident. Defendant gave Schrieber the clothing he was wearing the night of the incident, but he told Schrieber that he threw away the glass from the victim's apartment and he did not have the stocking. While the police officers were transporting defendant to the station, he said that the victim "was a nice lady up until this." On cross-examination, Schrieber conceded that the victim did not tell him that defendant beat and kicked her. Schrieber also admitted that the victim did not tell him that defendant grabbed or fondled her breasts.

Officer Jack Libman testified that footprints in the snow outside the victim's apartment matched the shoes defendant was wearing that night.

Dr. Christine Szymik testified that she examined the victim on February 2, 1992. The victim told her that she was beaten and kicked by an intruder. The victim had bruises on her right leg and tenderness and swelling in her right buttock. These injuries were

consistent with being beaten or kicked. Defense counsel asked Dr. Szymik if the injuries could have been caused by the victim striking objects such as a vanity or a toilet, and Dr. Szymik agreed that they could have.

Defense counsel moved for a directed finding on the home invasion and residential burglary charges. Counsel argued that the State failed to prove that defendant intentionally injured the victim or that the victim sustained bodily harm, and the State failed to prove that he intended to commit a sexual assault. The court denied the motion.

As part of defendant's case, Officer Brian Healey testified that he was the first officer to interview the victim on January 29. The victim told him only that defendant "leaned against her buttocks."

The court found defendant guilty of all the charges. Defendant filed a motion in arrest of judgment, arguing that the charging instrument did not allege properly the elements of aggravated battery. Defendant also moved for a new trial on the basis that the State failed to prove beyond a reasonable doubt that he committed home invasion and residential burglary. The court denied both motions.

According to the presentence report, defendant was hospitalized from April 27 to May 2, 1992. The report stated:

"Following a Court date in April, the defendant became increasingly depressed and threatened suicide at an outpatient clinic he had gone to regarding his sexual abuse issues. He was subsequently referred for hospitalization. A drug toxicology done was positive for cannabinoids. The defendant was discharged with medication (Anafronil and Zoloft). Continued treatment was recommended. The final diagnoses were Adjustment Disorder with Depressed Mood and Voyeurism and Histrionic Personality Disorder."

An addendum to the presentence report, filed on August 11, 1992, contained the findings of Patricia Porter, of Clinical Behavior Consultants. According to Porter, defendant " 'appears to suffer from serious personality problems as well as being emotionally unstable. He is subject to quick and intense mood changes. He tends to act out impulsively and may become emotionally labile and explosive. *** His thinking is unrealistic, his judgement poor, and he is extremely immature, expects others to cater to him, and distorts other's reactions to him.' " Porter also opined that defendant was unable to " 'recognize the pattern of his deviant sexual behavior and may be compulsively driven to act out his fantasies' " and " 'aggressive rape-like impulses.' "

Defendant first contends that he was denied the effective assistance of counsel because his attorney failed to raise the insanity defense. For a defendant to establish the ineffective assistance of counsel, he must show that counsel's performance was deficient and that deficiency prejudiced the defendant. (*Strickland v. Washington* (1984), 466 U.S. 668, 697, 80 L. Ed. 2d 674, 699, 104 S. Ct. 2052, 2069; see also *People v. Albanese* (1984), 104 Ill. 2d 504.) We need not consider whether counsel's performance was deficient if the alleged errors did not prejudice defendant. (*Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.) A defendant has been prejudiced if the result of the trial would have been different. *People v. Jones* (1993), 155 Ill. 2d 357, 367.

Although defendant cites cases addressing a defendant's fitness to stand trial, that question is irrelevant to whether the defendant was insane at the time of the crime. (*People v. Scott* (1992), 148 Ill. 2d 479, 531.) A defendant is presumed fit to stand trial (Ill. Rev. Stat. 1991, ch. 38, par. 104—10 (now 725 ILCS 5/104—10 (West 1992))), and as defendant has failed to point to anything in the record to indicate that he was unable to understand the nature and purpose of the proceedings or to assist in his defense, defendant's fitness is not an issue.

Insanity is an affirmative defense which the defendant bears the burden of proving by a preponderance of the evidence. (Ill. Rev. Stat. 1991, ch. 38, par. 6—2(e) (now 720 ILCS 5/6—2(e) (West 1992)); *People v. Aspelmeier* (1993), 250 Ill. App. 3d 803, 808.) A person is relieved of liability for his conduct if "at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." (Ill. Rev. Stat. 1991, ch. 38, par. 6—2(a) (now 720 ILCS 5/6—2(a) (West 1992)).) The trier of fact may reject an expert's opinion and base its decision on the facts in evidence and inferences drawn therefrom, including the testimony of lay witnesses. (*People v. Baker* (1993), 253 Ill. App. 3d 15, 27-28.) The relevant factors indicating sanity include the existence of a plan for the crime and methods to prevent detection. *People v. West* (1992), 231 Ill. App. 3d 646, 651.

■ Counsel's failure to raise an insanity defense did not prejudice defendant. The victim observed defendant throughout the commission of the offense, and the trier of fact could rely on her observations. The evidence showed that defendant had been watching the victim, he entered her apartment when she was in the shower, and he wore a stocking over his head to conceal his identity. His statements to the victim demonstrated his awareness that his actions were wrong and

he could be punished for them. In addition, his comment that he did not do what he intended to do to the victim shows that defendant could control his actions. Finally, the psychological reports in the record do not suggest that defendant was delusional or unable to control his actions. Thus, even had an insanity defense been presented, there is no reasonable probability that the trial court would have accepted it.

The cases cited by defendant are distinguishable. In *People v. Young* (1991), 220 Ill. App. 3d 98, the trial court had found the defendant unfit to stand trial and a mental health professional opined that the defendant was " 'highly delusional, confused, irrelevant, and illogical.' " (*Young*, 220 Ill. App. 3d at 101.) The appellate court concluded that the defendant was denied the effective assistance of counsel at the discharge hearing because counsel put on no witnesses and engaged in minimal cross-examination and argument on an unsound legal theory. (220 Ill. App. 3d at 107-08.) In addition, the court found that counsel's failure to investigate the defendant's prior hospitalizations prejudiced him because "even a cursory investigation would have discovered evidence relevant to defendant's defense." (220 Ill. App. 3d at 109.) Here, counsel vigorously cross-examined the witnesses, presented evidence, and moved for a directed finding on the two most serious charges, and, as noted above, defendant would not have prevailed on an insanity defense.

*People v. Rainey* (1986), 149 Ill. App. 3d 327, also is distinguishable. In *Rainey*, defense counsel misunderstood the defense of insanity and, at the sentencing hearing, requested the court to change the finding from guilty to guilty but mentally ill. (*Rainey*, 149 Ill. App. 3d at 330-31.) Here, there is nothing in the record to indicate that counsel's decision to forgo an insanity defense was anything other than trial strategy.

A defendant is entitled to competent, not perfect, representation. (*People v. Odle* (1992), 151 Ill. 2d 168, 173.) On matters of counsel's trial tactics or strategy, we defer to counsel's judgment unless the strategy was unsound. (*People v. Ramey* (1992), 151 Ill. 2d 498, 523-24.) Moreover, we evaluate counsel's performance under the circumstances as counsel viewed them, not with hindsight. *People v. Emerson* (1992), 153 Ill. 2d 100, 108.

At the time of trial, counsel was aware that defendant had been hospitalized because of suicide attempts. However, the diagnoses did not suggest that defendant was delusional or unable to comprehend his actions. Counsel chose to present a defense to the two most serious charges rather than advance a nonmeritorious insanity defense. Counsel's strategy was to attempt to secure an acquittal on the home

invasion and residential burglary charges for a lack of sufficient evidence and to present the psychological evidence in mitigation at the sentencing hearing. We must presume that counsel knew an insanity defense would not be successful and that to raise it would probably result in a finding of guilty but mentally ill (GBMI) or guilty to all the charges and that he rejected that outcome in favor of a plausible, if ultimately unsuccessful, defense to the most serious charges. (A finding of GBMI would have subjected defendant to the same range of sentences as a finding of guilty. (Ill. Rev. Stat. 1991, ch. 38, par. 1005—2—6(a) (now 730 ILCS 5/5—2—6(a) (West 1992)).)) Counsel's defense to the home invasion charge was particularly well-reasoned, as the indictment charged that defendant entered the victim's apartment with the intent to injure her. The information available to counsel before trial strongly suggested that defendant went to the victim's apartment to meet her and engage in sexual intercourse with her because he was obsessed with her, but that he did not intend to injure her. Although one need not admit to a crime to raise the insanity defense, here an insanity defense clearly was without merit. We conclude that counsel's trial strategy was not unsound and it was not unreasonable for counsel not to raise a nonmeritorious defense.

Defendant also argues that had his counsel raised the insanity defense, defendant could have been found GBMI. A defendant cannot be found GBMI unless he raises the defense of insanity. (*People v. Gosier* (1991), 145 Ill. 2d 127, 142.) In *Rainey*, a mental health professional opined that the defendant was "mentally ill," and the appellate court found that the defendant was prejudiced by counsel's failure to raise the insanity defense because the trial court stated that it would have found the defendant GBMI. (*Rainey*, 149 Ill. App. 3d at 331.) Unlike in *Rainey*, there is nothing in the record to indicate that there is a reasonable probability the trial court here would have found defendant GBMI as no mental health professional concluded that defendant was "mentally ill" and the trial court gave no indication that it would have made such a finding. Thus, defendant has failed to show that he was prejudiced by counsel's failure to raise the insanity defense. We conclude that defendant was not denied the effective assistance of counsel.

Defendant next contends that the 18-year sentence for home invasion was excessive. At the sentencing hearing, in addition to the preplea report and the presentence report, the court considered the following evidence. In mitigation, defendant's mother testified to the physical abuse defendant suffered as a child. Defendant's sister testified that her father forced her and defendant to engage in orgies when they were children. Defendant's wife testified that defendant

needed treatment for his problems and that he had been the primary financial support for their two children.

In aggravation, Barbara Balke testified that on February 3, 1991, defendant entered her apartment, and when she screamed, he left. On February 9, defendant again tried to enter Balke's apartment. She called the police and they apprehended him a short time later. The arresting officer testified that defendant admitted that he tried to remove the screen from Balke's apartment window and he was trying to look at her. Defendant also admitted that he entered the apartment on February 3 because "he wanted to get close to the victim, that he felt he could satisfy her desires and that he was the one that would be capable of doing this *** as part of his sexual fantasy." The court also considered the victim impact statement.

The State argued that defendant should be sentenced to 20 years for the home invasion conviction because of his increasingly dangerous behavior. Defense counsel argued that defendant needed treatment and pointed out that defendant could benefit from counseling with Sex Anonymous. Counsel further argued that the psychological evidence showed that defendant suffered from impaired judgment and severe mental distress with a severe personality disfunction. Because this was defendant's first felony conviction and he lacked a history of violence, counsel urged the court to sentence defendant to the minimum term of six years with a recommendation of placement at Graham or Dixon Correctional Center so defendant could get assistance for his sexual problems.

In allocution, defendant apologized for his actions and stated that he had not had "the capability of understanding a lot of things," but he came to realize the seriousness of his actions.

The court found that none of the statutory factors in mitigation applied; however, the court stated:

> "The Court has to take recognition of the fact that the Defendant is married, has a family, has served in the armed forces.
> ***
> He has been actively employed. He has had classes for purposes of educating himself and also to look for and to better himself as far as a vocation is concerned.
> The Court has to recognize, further, that there has been a family situation that has developed over the years. Certainly there has been abuse. It is uncontroverted. Those factors have to be taken into consideration. However, they do not in any way become that much of a mitigating circumstance that completely removes the ability to be sentenced.
> Certainly, the reports indicate that the Defendant was well

aware of what he was doing in the previous matters when he was convicted. He certainly was well aware of what he was doing at this particular incident and series of incidents."

In aggravation, the court found that defendant's conduct caused harm to the victim and he had prior convictions. The court also mentioned the need for deterrence.

Under Supreme Court Rule 615(b)(4), this court has the power to reduce the punishment imposed on a defendant by the trial court. (134 Ill. 2d R. 615(b)(4).) However, we may not reduce the sentence unless the trial court abused its discretion in sentencing defendant. (*People v. Gonzalez* (1992), 151 Ill. 2d 79, 89.) When the sentence is within the statutory range, the reviewing court will not modify it unless the sentence clearly departs from the principle that the sentence be proportionate to the nature of the offense and also provide for the defendant's rehabilitative potential. *People v. Lintz* (1993), 245 Ill. App. 3d 658, 668.

■Defendant asserts that the court failed to articulate adequately valid reasons for imposing the 18-year sentence. Specifically, defendant argues that there were mitigating factors which warranted a lesser sentence. However, the trial court is not required to recite and assign a value to each mitigating factor, and the existence of mitigating factors does not obligate the trial court to impose the minimum sentence. *People v. Madura* (1994), 257 Ill. App. 3d 735, 740-41.

Defendant further argues that the court should have found the statutory mitigating factor of provocation. (See Ill. Rev. Stat. 1991, ch. 38, par. 1005—5—3.1(a)(3) (now 730 ILCS 5/5—5—3.1(a)(3) (West 1992)).) According to defendant, his "tortured childhood of abuse and his resultant history of psychopathology clearly served to 'provoke' him." The State responds that in *People v. Griffiths* (1983), 112 Ill. App. 3d 322, 330, the court ruled that "[p]rovocation is usually restricted to physical assault, mutual quarrel or combat, [and] adultery." This definition derives from "serious provocation" which is sufficient to reduce the offense of first degree murder to second degree murder. (See *People v. Chevalier* (1989), 131 Ill. 2d 66, 71.) However, the court in *People v. Merritte* (1993), 242 Ill. App. 3d 485, rejected *Griffiths'* interpretation. Under *Merritte*, while "strong provocation" encompasses a wider range of conduct than that defined as "serious provocation" for purposes of second degree murder, for provocation sufficient to be a mitigating factor, it must be direct and immediate. (See *Merritte*, 242 Ill. App. 3d at 492-93.) We need not determine which authority to follow as, under either approach, defendant's childhood abuse and psychological problems do not amount to "strong provocation."

The sentence imposed is within the statutory range, and the trial court found several factors in aggravation, including the harm to the victim and the need for deterrence. The trial court is in the best position to determine the appropriate punishment. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 154.) The seriousness of the crime is the most important factor in fashioning a sentence. (*People v. McDonald* (1992), 227 Ill. App. 3d 92, 100.) Defendant's history showed an increasing pattern of dangerousness, in spite of his participation in sexual counseling. On these facts, we cannot say that the sentence here was an abuse of discretion.

The judgment of the circuit court is affirmed.

Affirmed.

DOYLE and COLWELL, JJ., concur.