# Illinois Official Reports

## Appellate Court

---

### *People v. Wood*, 2014 IL App (1st) 121408

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JONATHAN WOOD, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-12-1408 |
| Filed | July 23, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a case where a finding of guilty but mentally ill would have been appropriate and likely if defense counsel had raised an insanity defense and called an expert to testify at trial with respect to defendant's diagnosis with schizophrenia and defendant was prejudiced by his counsel's strategy, but defendant's own expert determined that defendant was not insane at the time he killed his mother and defendant refused to be examined by any other doctors, defense counsel could not have substantiated an insanity defense with a readily available witness, and asserting an insanity defense would have violated the ethical constraints on defense counsel to certify any defense without an adequate factual and legal basis; therefore, defendant's counsel was not ineffective in failing to pursue the statutorily required defense of insanity as a prerequisite for obtaining a finding of guilty but mentally ill, since he did not have and could not obtain supporting evidence for the insanity defense. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-22567; the Hon. Bridget Jane Hughes, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Robert N. Markfield, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary P. Needham, and Samuel C. Ray, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE MASON delivered the judgment of the court, with opinion. Presiding Justice Hyman and Justice Neville concurred in the judgment and opinion.

**OPINION**

¶ 1 Following a bench trial, defendant Jonathan Wood was convicted of first degree murder, concealment of a homicidal death, aggravated unlawful restraint, violating an order of protection, and aggravated fleeing or eluding a police officer. He was sentenced to consecutive prison terms of 61 years for first degree murder and 3 years for concealment of a homicidal death, for a total of 64 years. He received concurrent sentences of two years on each of the remaining counts. On appeal, Wood contends that he received ineffective assistance of counsel where his trial counsel (1) requested a finding of guilty but mentally ill without presenting the statutorily required defense of insanity; and (2) failed to call his expert at trial to testify that Wood suffered from paranoid schizophrenia at the time the offense was committed. Finding no merit to Wood's argument, we affirm the judgment of the circuit court of Cook County.

¶ 2                                    BACKGROUND

¶ 3 On October 31, 2008, the body of Marilyn Wood, Wood's mother, was discovered in the storage room of her basement. Marilyn's body was found on a couch at the back of the storage room with numerous items piled on top of her. Marilyn had been gagged, there was electrical cord around her neck and her hands were bound behind her back with electrical wire.

¶ 4 Marilyn's blue Saturn was missing from her garage. After Marilyn's body was discovered, Marilyn's office received a fax purportedly from Marilyn stating that she was attending a funeral in Minnesota. Her office notified the police and they went to the business originating the fax, where an employee described the man who had come in and asked her to send the fax. The police obtained a picture of Wood and the employee confirmed he was the person she had dealt with.

¶ 5 The police then situated themselves in vehicles at various points near Marilyn's residence to see if Wood would return to the home. Later that night, an officer saw the Saturn in the vicinity and it was pursued by multiple officers. A high speed chase ensued that lasted more than 30 minutes, with Wood, who was driving the Saturn, finally jumping out of the car, which

hit a tree, while Wood rolled down an embankment. Wood was taken into custody and subsequently charged with multiple offenses related to Marilyn's death and his flight from the police.

¶ 6    Prior to trial, the court granted a defense motion for a behavioral clinical examination to determine Wood's fitness to stand trial and his sanity at the time of the offense. The examination was conducted by Dr. Peter Lourgos of Forensic Clinical Services on July 31, 2009. Dr. Lourgos submitted a report to the trial court stating that Wood was unfit to stand trial because he was exhibiting symptoms of schizophrenia. The report further noted that because of Wood's current mental state, Dr. Lourgos was unable to render an opinion as to his sanity at the time of the alleged offense.

¶ 7    At the fitness hearing on September 29, 2009, Dr. Lourgos testified that Wood was unfit to stand trial because he had a lengthy documented history of schizophrenia and was currently exhibiting active symptoms of the illness which rendered him incapable of assisting counsel in his defense. Dr. Lourgos explained that Wood was actively psychotic, his judgment was impaired, and he had delusional ideations that the case was going to be dismissed. Dr. Lourgos opined that with treatment, Wood could attain fitness within one year. The trial court found that Wood was unfit to stand trial and was a danger to himself and others, but there was a good probability that he could be restored to fitness within one year with proper treatment. The court remanded Wood to the Illinois Department of Human Services with orders for the Department to propose a treatment plan within 30 days.

¶ 8    On October 4, 2010, Dr. Lourgos examined Wood again and submitted a report stating that Wood was fit to stand trial with medication. The report indicated that Dr. Lourgos was still unable to render an opinion on the issue of sanity at the time of the alleged offense. At the restoration hearing on November 12, 2010, Dr. Lourgos testified that Wood was currently able to cooperate with counsel in his own defense and was able to understand the nature of the proceedings and all of the charges against him. However, Wood declined to participate in a sanity evaluation and stated that he did not want to discuss the facts surrounding the alleged offense. The trial court found that Wood had been restored to fitness with medication and was fit to stand trial.

¶ 9    At a status hearing on December 29, 2011, defense counsel reported to the court that defense expert Dr. Robert Hanlon had completed his psychological evaluation of Wood but he would not be issuing a report. The court asked, "So you're not going to proceed on–" and defense counsel interrupted and said, "Correct. That's not–it's not our intention and it's not the desire of Mr. Wood. I was toying with the idea of having Mr. Wood examined by forensic clinical services but he indicated to me that he does not want to be examined by any other doctors and if he were to be sent up there, he'[d] refuse to cooperate."

¶ 10   At trial, defense counsel argued in his opening statement that Wood was not guilty because there was no direct evidence that would connect Wood to Marilyn's murder, or, in the alternative, Wood was guilty but mentally ill (GBMI). The parties stipulated that on September 5, 2008, Marilyn obtained an emergency order of protection against Wood and that on September 26, 2008, she obtained a two-year plenary order of protection. Wood was present when the plenary order of protection was issued and was personally served in open court with the order. The order granted exclusive possession of the residence to Marilyn and prohibited Wood from physically abusing or harassing Marilyn, or from having any contact with her

whatsoever. The parties further stipulated that Marilyn previously obtained a similar order of protection in October 2002.

¶ 11 We need not recite in any detail the evidence of the gruesome murder of Wood's mother adduced at trial except to note that it overwhelmingly establishes Wood's guilt and, in fact, he does not contend otherwise on appeal. The only evidence we need focus on for purposes of addressing the ineffective assistance claim raised by Wood on appeal is that which bears upon his counsel's decision not to assert insanity as a defense.

¶ 12 On the evening of October 12, 2008, John Larsen, a friend of Wood's since childhood, spoke with Wood on the phone. Wood was angry and upset with Marilyn because, due to the order of protection, he was homeless. Wood used a lot of profanity, something he did not normally do, and said that his mother was "worse than an infidel" and that she was a "greedy Jezebel."

¶ 13 On cross-examination, Larsen explained that while he never talked to Wood about whether he was taking any medication, he was aware that Wood had been treated by mental health professionals in the past. Larsen testified that he had admitted Wood to Alexian Brothers approximately 10 years earlier and had visited him a number of times at another institution while he was hospitalized.

¶ 14 Andrea Dittman and Marilyn worked for the same company. Dittman testified that Marilyn was an attentive, prompt employee who had never missed a day of work without notifying her supervisor. On the morning of October 30, 2008, Marilyn did not come to work at her regular starting time of 8:30 and did not call her supervisor. After failing to reach Marilyn at home, Dittman called the police and asked them to do a well-being check. On October 31, when Marilyn again failed to come to work, Dittman called the police again and asked them to do another well-being check. Approximately an hour later, a handwritten fax was received at Marilyn's office. The fax said: "Went to Minnesota. Bro-in-law funeral. Emergency. Back Wednesday afternoon." Dittman called the company shown at the top of the fax and was given a description of the person who asked a company employee to send the fax. Dittman then notified the police.

¶ 15 Claudia Sanchez was working at the Confia Insurance Agency on October 31, 2008. At approximately 9:45, Sanchez observed a blue Saturn pull into the agency's parking lot with the tires squealing. Sanchez identified Wood as the individual who was driving the Saturn and subsequently came inside the agency and asked her to send a fax.

¶ 16 The police officers who responded to the request for a well-being check on October 30 were able to gain entry through an unlocked door. Marilyn's blue Saturn was inside the garage but the officers did not find anyone in the house. One officer checked the storage room in the basement, but did not walk all the way inside the room and inspect the part of the room that was blocked from view by the open door.

¶ 17 When the police returned to the house the following morning, the Saturn was gone. This time, an officer went completely inside the basement storage room, closed the door behind him and walked along a cleared pathway that extended to the end of the room. Using his flashlight, the officer saw a human leg sticking out on the armrest of a couch at the far end of the room from underneath a pile of debris. Upon closer inspection, the officer determined that the person was deceased.

¶ 18     After Marilyn's body was discovered and the officers determined that Wood had sent a fax to her office, police officers were stationed at various locations leading to Marilyn's residence, with instructions to be on the lookout for Marilyn's blue Saturn. At approximately 9:37 p.m., a blue Saturn was spotted approaching the residence but then turning away after coming into view of a large police forensic van with lights on top. The officer who spotted the Saturn followed it, verified by the license plate that it was Marilyn's vehicle, and radioed other officers.

¶ 19     Another officer approached from a different direction to assist in an unmarked car with the lights activated. The Saturn stopped but when the officer started to exit his vehicle, the Saturn went eastbound in the westbound lanes of Biesterfield and then cut across the median to go eastbound in the eastbound lanes. Three police cars with lights and sirens activated pursued the Saturn south on Route 53 to I-290 and from there to I-294. The Saturn was traveling at a high rate of speed and the driver was using the right and left shoulders of the highway to avoid traffic. At one point during the pursuit, the officers reached speeds of 125 miles per hour.

¶ 20     The pursuit continued as the Saturn exited I-294 at Willow Road and eventually proceeded to Park Boulevard in the town of Glencoe. The street ended and the Saturn turned into a park and proceeded on a pedestrian path. The driver got out of the vehicle while it was still rolling and the Saturn continued rolling until it hit a tree. The driver fell over a steep embankment onto another pedestrian path, approximately 35 feet below. The officers pursued the driver on foot and took him into custody. Wood was identified in court as the driver of the Saturn.

¶ 21     Officer Frank Gottardo, one of the officers in pursuit of the Saturn, testified that after Wood drove onto a pedestrian path and jumped out of the car, he fell to the ground and the Saturn rolled into a tree. Wood got back up, took a step to the right, and then disappeared into the darkness. Officer Gottardo followed him and discovered that Wood was rolling down a bluff toward the beach. Officer Gottardo went down the embankment to the south of where Wood was rolling. On his way down, Officer Gottardo broke his left foot going over a retention wall but continued to pursue Wood, tackling him to the ground and putting him in handcuffs. Officer Gottardo searched Wood and, from the pocket of his jacket, recovered several credit cards and a health insurance card, all in Marilyn's name, Marilyn's driver's license, and a number of documents. Among the documents was one that purported to grant Wood power of attorney over Marilyn's estate.

¶ 22     Officer Mike Carlson inventoried the items that were recovered from Wood's jacket. One of the items recovered was a note that appeared to have been written in marker. It said: "Went to Minnesota. Bro-in-law funeral. Emergency. Back Wednesday afternoon." It was signed "Marilyn Wood." A fax number was written twice on the back of the note. A fax transmission report was also recovered. The report showed that a fax was transmitted from Confia Insurance Agency to the number that was written on the back of the note.

¶ 23     Dr. Joseph Cogan, an expert in forensic pathology, performed Marilyn's autopsy. Marilyn's body was fully clothed and she was gagged and bound. There was a scarf wrapped around her neck and over her mouth, covered by a white towel, with speaker wire wrapped around the towel to keep it tight. There were also wet paper towels inside her mouth. There was a petechial hemorrhage at the back of her throat, indicating that she was alive at the time the gag and bindings were put in place. Dr. Cogan explained that because Marilyn's tongue was forced into the back of her throat blocking her airways, death would have occurred within a few minutes of the time she was gagged.

¶ 24    Dr. Cogan described multiple bruises, contusions and fractures on Marilyn's head and upper body, including a subdural hemorrhage inside her skull, caused by blunt force trauma. Based on the aspiration of blood in her stomach and the fact that her bladder was filled with urine and there was urine on her clothing, Dr. Cogan concluded that Marilyn was alive when she received the blunt force trauma and that she was immobilized for a long period of time. Dr. Cogan opined that the cause of death was multiple injuries as a result of an assault.

¶ 25    Finally, the parties stipulated that at a hearing on December 13, 2010, Wood stated in open court: "I had restrained her, I had restrained her, I hadn't done anything more than restrain her." The State rested and Wood's motion for a directed verdict was denied.

¶ 26    Defense counsel proceeded by way of stipulation. The parties stipulated the following: (1) Dr. Lourgos examined Wood on July 31, 2009, diagnosed him as having paranoid schizophrenia, and concluded that he was unfit for trial; (2) Wood was admitted to Elgin Mental Health Center on October 21, 2009, and was prescribed an antipsychotic medication and a mood-stabilizing medication; (3) Wood was diagnosed as having paranoid schizophrenia by Dr. Romulo Nazareno at Elgin on November 3, 2009; (4) Dr. Nazareno again diagnosed Wood as suffering from paranoid schizophrenia on September 4, 2010, but found him fit for trial with medication; (5) Dr. Lourgos concurred in the diagnosis of paranoid schizophrenia on October 4, 2010, and also found Wood fit for trial with medication, but was unable to render an opinion on sanity because Wood refused to be evaluated on that issue; (6) Dr. Robert Hanlon examined Wood on June 9, 2011, and concurred in the diagnosis of paranoid schizophrenia and the finding that Wood was fit for trial with medication; and (7) Dr. Hanlon examined Wood again on July 18, 2011, and concluded that he was not insane at the time of the alleged offense.

¶ 27    Wood then took the stand against defense counsel's advice. He explained that he wanted to testify so that "the Judge [would] have a real account of the actual events that happened." Wood testified that he had been hospitalized for mental illness three different times for two weeks each time. The first time was in 1997, around the time of his parents' divorce. He was hospitalized a second time in 1999 or 2000 and again in 2004 or 2005.

¶ 28    Wood explained that he had been hearing angels' voices and sensing the presence of angels since he was eight or nine years old. He had heard between 77 and 2,000 voices and they had spoken to him directly and also talked among themselves. Wood never told anyone about hearing voices, and when he was later hospitalized, he was told that it was "a schizophrenic thing" to be hearing voices so he was careful never to discuss it with people.

¶ 29    Each time Wood went to the hospital it was because he was having trouble sleeping and his mother wanted him to go and get some help. However, he did not take the antipsychotic medication they gave him after he left the hospital because he did not think there was anything wrong with him. Wood's brother David was also diagnosed with schizophrenia.

¶ 30    Wood explained that his mother asked him to leave her house because he was "being entirely messy." Wood went to the Red Roof Inn, but on October 27, when he started running out of money, he went back to Marilyn's house and asked her to let him stay in the basement so that he would have a place to sleep.

¶ 31 On October 29,[1] Wood was in the basement asleep when he heard Marilyn coming down the stairs at 4 or 5 a.m. Marilyn fell down the basement stairs in the dark and called out to Wood. When Wood turned on the light and went to her, Marilyn was facedown on the carpeted stairs. Wood saw that Marilyn's face was bloody and she told him she thought she had broken her arm. Wood thought he heard an angel named Coda clapping at the top of the stairs.

¶ 32 Marilyn told Wood that if he took her to the hospital, she would not tell "them" Wood was at her house. Wood wondered who Marilyn meant by "them" and decided she could not mean the doctors so she must mean the police. Wood told Marilyn that she could not tell anyone he was there because that would be a violation of the restraining order and then he would have to go to jail. In the meantime, Wood was silently asking the angels if Marilyn's arm was really broken and Coda told him that Marilyn's arm was not broken and there was nothing wrong with her.

¶ 33 Wood felt Marilyn's arms and she appeared to be fine. He ran upstairs and put some water on a paper towel so that he could clean up Marilyn's face from what appeared to be a nosebleed. Marilyn also had a little bit of blood on the inside of her lip, but she did not have a black eye or any visible bruising.

¶ 34 Although Marilyn told Wood she would not tell anyone he had been at her house, Wood did not believe her because he thought she was also lying to him about having a broken arm. He decided to restrain Marilyn so that she would not be able to tell the police that he had been there. When Wood got an orange extension cord and began to tie Marilyn's hands behind her back, she started calling out for help. Wood did not want the neighbors to hear her, so he put the paper towel he had used to clean up the blood in her mouth and also put the orange cord through her mouth. Wood then carried Marilyn to the couch in the storage room and left her there.

¶ 35 Wood was in the basement when he heard the police knocking on the door on October 30. He ran upstairs and hid in the front bedroom closet. Wood asked Michael, the archangel, to just have the police do a cursory check and then leave. Wood heard a police officer come down the hallway, but the officer left without coming into the bedroom.

¶ 36 After the police left, Wood went back downstairs and saw that the door to the storage room was open. He went inside the room and saw Marilyn kicking her foot in the air on the couch and could hear her mumbling, "ah, ah" through the cord that was in her mouth. Wood was afraid that if the police came back looking for her they would see her foot kicking in the air, so he put a rolled carpet on top of her. Marilyn was still able to kick her foot so Wood took part of the extension cord and tied her foot down to the ground. He also put a towel over Marilyn's mouth and wrapped speaker wire around the towel. Wood did not remember putting a suitcase, clothing or plastic bags filled with things on top of the carpet, and did not remember tying Marilyn's hands with speaker wire.

¶ 37 The next morning, Wood wrote out a note saying that Marilyn had gone to Minnesota because of a death in the family, signed it, and left the house so that he could fax it to Marilyn's employer. Before leaving the house, Wood took Marilyn's credit card from her purse so that he could put gas in the car in case he needed to take her to the hospital.

---

[1]Although Wood testified that this happened in the early morning hours of October 29, the parties stipulated that Marilyn was videotaped using her credit card at a grocery store at 7:15 p.m. on October 29 and her coworker testified that Marilyn did not miss work until October 30.

¶ 38 　　After sending the fax to Marilyn's office, Wood ran some errands and signed up two new clients for his business. When he tried to return to the house much later that evening, he saw a police car that turned around and followed him. Wood thought the police were going to try and kill him because he tied Marilyn up, so he "hit the gas and took off." When defense counsel asked Wood why he wanted to testify, Wood reiterated that he wanted the judge to know exactly what he had done. Wood stated that he had no idea Marilyn could die from being tied up, and that in his entire life, he had never heard of anyone dying from being tied up. He testified he did not kill Marilyn and that all he had done was unlawfully restrain her.

¶ 39 　　During closing argument, defense counsel told the trial court that his first argument had been that there was no direct evidence against Wood. However, because Wood had testified against counsel's advice and admitted to tying Marilyn up and gagging her, he could no longer make that argument. Instead, defense counsel told the court that, if anything, Wood's testimony revealed that he is clearly mentally ill and counsel asked the court to make a finding of GBMI.

¶ 40 　　The trial court found Wood guilty on all counts. In explaining its ruling, the court stated that in order for the court to enter a finding of GBMI, the defense would have had to prove by a preponderance of the evidence that Wood was mentally ill at the time he committed the offense. However, all of the stipulations presented by the defense involved examinations after the offense. Moreover, none of the doctors testified regarding Wood's mental state at the time of the offense. The trial court noted that there was evidence regarding past medical history, but that was not sufficient and would require the trial court to make a "leap."

¶ 41 　　At a hearing on Wood's *pro se* posttrial motion that his trial counsel was ineffective, Wood told the court that his trial counsel advised him to plead not guilty by reason of insanity but that Wood did not want to because he knew he did not kill Marilyn and he wanted his attorney to argue involuntary manslaughter. Wood explained that he committed the reckless act of tying Marilyn up that caused her death but her death was accidental and was a result of the injuries she initially suffered from falling down the stairs.

¶ 42 　　Defense counsel testified he told Wood that the defense of involuntary manslaughter was not a workable defense because, beyond Wood's testimony, there was no evidence that Marilyn had fallen down the stairs. However, defense counsel did not want Wood to testify because the cause of death was not merely blunt force trauma but also asphyxiation and Wood would therefore be admitting guilt in testifying that he bound and gagged Marilyn. Defense counsel also testified that he contacted the coroner and had a private conversation with him, and the coroner told him that Marilyn's injuries were inconsistent with a fall down the stairs. The trial court denied the motion, finding that defense counsel's representation was effective and that even if defense counsel had pursued the strategy Wood requested, there was overwhelming evidence of Wood's guilt.

¶ 43 　　In support of his motion for a new trial, defense counsel explained to the court that he did not raise an insanity defense for two reasons: (1) he did not have an expert who would testify that Wood was insane at the time of the offense, and (2) doing so would have allowed the State to hire its own expert to examine Wood and would also have allowed the State access to Dr. Hanlon's findings. Instead, defense counsel said he thought that under the circumstances of the case, it would be appropriate for the court to enter a finding of GBMI.

¶ 44 　　The trial court denied the motion for a new trial, explaining that there was not sufficient evidence that Wood was mentally ill at the time of the offense to support a finding of GBMI.

The trial judge also stated for the record that she had observed Wood during his testimony, specifically, the way he responded to her, the way he looked at her while he answered the questions he was asked, and the way he explained things to her. She stated that she did not believe Wood, further explaining that she thought he was malingering and dishonest, he exaggerated, and his statements were self-serving.

¶ 45 At Wood's sentencing hearing, the State presented evidence of a 1998 incident where Wood pleaded guilty to public indecency and disorderly conduct after trying to lure two teenage girls into his car. The State also presented evidence of the following domestic incidents that occurred at Marilyn's residence: (1) in 1999, Marilyn called to request ambulance transport for Wood to a hospital for psychiatric evaluation after Wood kept her up most of the night talking and acting irrationally and an hour later she awoke to find Wood standing in her room holding a steak knife to his chest; (2) in 2002, when police attempted to arrest Wood on a home monitoring violation, he locked himself in the bathroom and continued to resist arrest after police officers kicked the door in; (3) in 2002, the day Marilyn obtained an order of protection against him, Wood removed items from the house that he had purchased using Marilyn's credit card without her permission and drove away in a car that Wood obtained registration for by forging Marilyn's name on the title; and (4) in 2008, Marilyn barricaded herself in her bedroom and called the police to take her to the courthouse to obtain an order of protection because Wood had kept her up all night screaming and playing loud music and she was afraid that he would prevent her from leaving the house to obtain the order.

¶ 46 In mitigation, defense counsel called Dr. Robert Hanlon. Dr. Hanlon interviewed Wood on three separate occasions. Dr. Hanlon conducted an extensive seven-hour neuropsychological examination, an assessment of Wood's fitness to stand trial, and an assessment of Wood's sanity at the time of the offense. Dr. Hanlon concluded that Wood suffered from schizophrenia, a chronic disabling mental disorder characterized by hallucinations and delusional thinking, for which there is no cure.

¶ 47 Wood related to Dr. Hanlon that he was concerned that Marilyn was going to take action regarding the restraining order so he caused Marilyn to fall down the stairs. Wood did not think Marilyn was significantly injured and he restrained her on a couch in a room in the basement. Wood subsequently tied one of Marilyn's legs down so that she could not move that leg and eventually put some type of large cushion on top of her and left her there.

¶ 48 On the basis of Wood's description of his thoughts and actions at the time of the offense, Dr. Hanlon concluded that Wood could appreciate the criminality of his actions. Although Wood stated consistently throughout his interviews that he had regular communication with a multitude of angels, good and bad, and Dr. Hanlon believed this manifestation of psychotic symptoms had been ongoing for years and was present at the time of the offense, Dr. Hanlon concluded that Wood killed Marilyn not because of his psychotic symptoms but because he did not want to go to jail. Wood understood that there was an existing order of protection and that he was not allowed to be near Marilyn or inside her house. On redirect, Dr. Hanlon explained that he had conducted tests to determine whether Wood was malingering, that is fabricating or exaggerating symptoms, and the results of the testing showed that Wood was not malingering psychiatric symptoms, psychopathology or cognitive problems.

¶ 49 Wood addressed the court and stated that he knew that he tied his mother up and that tying her up was wrong, but he did not intend to kill her and did not have any idea that she could die

from being tied up. He thought he was simply preventing her from going to the police and believed that the longer she was tied up, the happier she would be when he released her.

¶ 50    The trial court explained that an extended-term sentence was appropriate because the following aggravating factors were present: (1) the crime was brutal and heinous, indicative of wanton cruelty; (2) the victim was over the age of 60; and (3) there was an order of protection in place at the time of the murder where the victim was the petitioner and Wood was the respondent. The trial court sentenced Wood to 61 years for first degree murder and a consecutive 3 years for concealment of a homicide, for a total of 64 years in prison. Wood was sentenced to two years on each of the remaining charges, to run concurrently. The motion to reconsider sentence was denied and Wood timely filed this appeal.

¶ 51                                                    ANALYSIS

¶ 52    Wood contends that trial counsel provided ineffective assistance when he (1) requested a finding of GBMI without presenting an insanity defense, and (2) failed to call his expert to testify at trial that Wood suffered from a mental illness–paranoid schizophrenia–at the time of the commission of the offense.

¶ 53    As an initial matter, the State argues that Wood has forfeited his claims of ineffective assistance on appeal by failing to raise them in his *pro se* posttrial motion, in which he raised other claims of ineffective assistance. Therefore, the State contends that we can only review these claims for plain error. The plain-error rule applies to unpreserved errors, and in order to preserve an error for review, a defendant must both object to the error at trial and raise the issue in a posttrial motion. *People v. Thompson*, 238 Ill. 2d 598, 611-13 (2010).

¶ 54    The State's argument is not well taken. The State does not even acknowledge the obvious: that defense counsel certainly did not object at trial on the grounds of his own ineffectiveness. If we were to carry this argument to its logical extreme, it would mean that all ineffective assistance claims are unpreserved errors that must be reviewed for plain error, because it is not likely that trial counsel would ever object at trial on the grounds of his or her own ineffective assistance.

¶ 55    In fact, although the State cites to standard authority that a defendant preserves an error for review by objecting at trial and raising the issue in a posttrial motion, the State does not frame its argument in terms of whether the claimed error has been preserved. Instead, the State argues that because Wood raised some ineffective assistance claims in his *pro se* posttrial motion, he has forfeited all remaining ineffective assistance claims and the plain-error rule should apply. In other words, if Wood had not raised any ineffective assistance claims at all in his *pro se* motion, then the plain-error rule would not apply, but because he did, he can only obtain plain-error review of any ineffective assistance claims that were not raised. The State cites no authority for this proposition, and we note that adopting such a position would impose undue hardship on criminal defendants who believe they have received ineffective assistance but cannot afford to retain other counsel in connection with their posttrial motions and therefore must raise such claims *pro se*.

¶ 56    Moreover, this court has noted that claims of ineffective assistance and the plain-error rule overlap because a successful claim of ineffective assistance of counsel would necessarily satisfy the second prong of the plain-error rule. *People v. McCarter*, 2011 IL App (1st) 092864, ¶ 37 ("The second prong of the plain error rule is triggered if a defendant can successfully

- 10 -

prove ineffective assistance of counsel [because] this is considered a substantial impairment of fundamental rights ***.'' (Internal quotation marks omitted.)). Therefore, we will consider the merits of Wood's ineffective assistance claims independent of the plain-error doctrine.

¶ 57　　　The State also contends that Wood's ineffective assistance claims are barred by the doctrine of invited error. The State argues that because Wood refused to allow his attorney to pursue an insanity defense and repeatedly stated that he wanted his attorney to pursue an involuntary manslaughter defense, he cannot now complain that his attorney was ineffective on the grounds that he failed to pursue a strategy that Wood did not want him to pursue.

¶ 58　　　"Under the doctrine of invited error, an accused may not request to proceed in one manner and then later contend on appeal that the course of action was in error." *People v. Carter*, 208 Ill. 2d 309, 319 (2003). The doctrine of invited error has been held to bar review of claims on appeal in cases where a defendant opposed the giving of a lesser-included-offense instruction to the jury but argued on appeal that the instruction should have been given (*id.*), tendered an instruction to the jury but claimed the instruction was erroneous on appeal (*People v. Patrick*, 233 Ill. 2d 62, 77 (2009)), and requested the very verdict forms that were challenged on appeal (*People v. Villarreal*, 198 Ill. 2d 209, 227 (2001)).

¶ 59　　　We have found no circumstances similar to the facts of this case in which the doctrine has been applied, and we decline to apply it here. Wood's trial counsel pursued two arguments at trial, namely, that there was no direct evidence tying Wood to Marilyn's murder and, in the alternative, that Wood was guilty but mentally ill. Notably, Wood's trial counsel did not pursue the theory that Wood wanted him to pursue, that Wood committed involuntary manslaughter. The record is also clear that trial counsel did not abandon an insanity defense merely because Wood did not want him to pursue it but, rather, because he did not have the necessary evidence to support such a defense and did not want to allow the State to hire an expert to interview Wood or to access his own expert's findings. Therefore, we will address the issue of whether trial counsel's decisions amounted to ineffective assistance.

¶ 60　　　Ineffective assistance of counsel claims are measured against the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on a claim of ineffective assistance, a defendant must show both that counsel's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 687-88, 694; see also *People v. Edwards*, 195 Ill. 2d 142, 162-63 (2001). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

¶ 61　　　To establish that trial counsel's performance was deficient, a defendant must overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy. *People v. Evans*, 186 Ill. 2d 83, 93 (1999). A reviewing court is highly deferential to trial counsel on matters of trial strategy and must make every effort to consider counsel's performance from his perspective at the time, rather than in hindsight. *People v. Perry*, 224 Ill. 2d 312, 344 (2007).

¶ 62　　　Under Illinois law, a defendant must raise the defense of insanity in order to be eligible for a GBMI conviction. *People v. Gosier*, 145 Ill. 2d 127, 142 (1991). When the defendant has raised an insanity defense, a court may find the defendant guilty but mentally ill if the State has proven the defendant guilty of the offense beyond a reasonable doubt, the defendant has failed to prove insanity, and the defendant has proven by a preponderance of the evidence that he was mentally ill at the time of the offense. 725 ILCS 5/115-3(c)(1)-(3) (West 2010).

¶ 63    Although this court may dispose of an ineffective assistance claim without considering whether counsel's performance was deficient if a defendant fails to establish prejudice, we believe that Wood has established prejudice here. Under the statute, a defendant whose insanity defense fails may be found GBMI if he establishes by a preponderance of the evidence that he was mentally ill at the time of the offense. As the State points out, the trial court considered whether Wood had met this burden even though he did not present an insanity defense, and concluded that he had not. Although the finding would not have been available to Wood here regardless of whether Wood had met this burden, it is clear that if defense counsel had raised an insanity defense and Dr. Hanlon or another expert had testified at trial, a finding of GBMI would have been appropriate.

¶ 64    Some of the trial court's comments seem to indicate that the trial court may have conflated the symptoms of mental illness with the illness itself. However, the trial court also appeared to believe that without expert testimony that Wood was suffering from a mental illness at the time of the offense, even though there was evidence of a history of mental illness, a GBMI finding was inappropriate. We note that the statute does not require such expert testimony. Rather, the defendant must simply prove by a preponderance of the evidence that he was suffering from a mental illness at the time of the offense, and the trial court noted that there was evidence of a long history of mental illness.

¶ 65    We do not believe it requires a "leap" to conclude that if a person has presented uncontradicted evidence that he was diagnosed with a mental illness a number of years before an offense, although there may be times when his symptoms are not acute or are controlled with medication, the underlying illness does not disappear. Therefore, uncontradicted testimony that Wood had been treated for mental illness prior to the murder together with stipulations by multiple doctors who examined Wood after the murder and were in agreement that Wood suffered from schizophrenia would have been sufficient to prove by a preponderance of the evidence that Wood was mentally ill at the time of the murder.

¶ 66    But even if the trial court correctly concluded that more evidence was needed to establish the fact of Wood's mental illness at the time of the offense, such evidence would have been amply provided if Dr. Hanlon had testified at trial. At the sentencing hearing, Dr. Hanlon testified that schizophrenia is a degenerative brain disease with no cure, at least seven doctors had diagnosed Wood with schizophrenia, and the medical records established he had been suffering from the illness for more than a decade prior to the murder. Dr. Hanlon further testified that although Wood's illness did not prevent him from understanding the criminality of his actions and did not cause him to commit the offense, he manifested psychotic symptoms during the offense in the form of delusions that angels were present and he was communicating with them. Thus, if defense counsel had raised an insanity defense and Dr. Hanlon had testified at trial, the result would almost certainly have been a finding of GBMI.

¶ 67    We reject the State's argument that Wood cannot show prejudice because a finding of GBMI would result in no difference to Wood. In support of this argument, the State points to the statutory provision that allows the court to impose any sentence that could have been imposed in the absence of a finding of mental illness. See 730 ILCS 5/5-2-6(a) (West 2010). Yet, the State then goes on to point out that there is, in fact, a difference. Upon a finding of GBMI, the Illinois Department of Corrections "shall cause periodic inquiry and examination to be made concerning the nature, extent, continuance, and treatment of defendant's mental illness" and "shall provide such psychiatric, psychological, or other counseling and treatment

for the defendant as it determines necessary." 730 ILCS 5/5-2-6(b) (West 2010). While a finding of GBMI would most likely not have resulted in a lower sentence, especially given that the trial court stated at the sentencing hearing that it had considered in mitigation that Wood "suffer[ed] from a mental disturbance and a brain disease," it would have entitled Wood to the treatment provided in section 5-2-6(b). See also *People v. Rainey*, 149 Ill. App. 3d 327, 331 (1986) (noting that while a GBMI finding may not have resulted in a reduced sentence, the defendant was deprived of statutorily provided treatment). Wood has therefore established prejudice in the absence of a finding of GBMI. To conclude otherwise would be to render a finding of GBMI meaningless.

¶ 68    Therefore, we must address the issue of whether counsel's performance was deficient. We conclude that it was not.

¶ 69    Wood relies on *Rainey*, in which this court held that the failure to assert a defense of insanity at trial in order to obtain a finding of GBMI constituted ineffective assistance of counsel. See *id*. In *Rainey*, the defendant underwent a psychological examination prior to trial and was determined to be fit to stand trial but mentally ill. *Id*. at 328-29. At trial, no evidence was presented concerning the defendant's mental condition. *Id*. at 329. However, at the sentencing hearing, the expert who examined the defendant prior to trial testified that he was mentally ill at the time of the offense. *Id*. On the basis of the expert testimony, defense counsel asked the court to amend its finding to GBMI. *Id*. The request was denied on the grounds that a finding of GBMI was not available. *Id*. The trial court stated that if defense counsel had raised the defense of insanity and presented at trial the expert testimony that was provided at the sentencing hearing, the court would have had no choice but to enter a finding of GBMI. *Id*. at 329-30.

¶ 70    The State attempts to distinguish *Rainey* on the grounds that the trial court in *Rainey* stated that if counsel had argued insanity and presented the expert testimony that was presented at the sentencing hearing, it would have entered a finding of GBMI, whereas the court here considered and rejected a request for a finding of GBMI. This argument is unavailing. As previously discussed, the trial court here never acknowledged that the finding was statutorily unavailable but instead rejected defense counsel's request on the grounds that no evidence had been presented at trial on the issue of whether Wood was mentally ill at the time of the offense. It follows then, even without the trial court explicitly making such a statement, that if such evidence had been presented, a finding of GBMI would have been appropriate if an insanity defense had been raised.

¶ 71    There are, however, two significant differences between the facts of this case and the facts in *Rainey*. First, the defendant in *Rainey* was found fit to stand trial and no evidence of his mental condition was presented at trial. Here, Wood was originally found unfit to stand trial and required a year of treatment to be restored to fitness, and there was ample evidence presented at trial of Wood's long history of mental illness and the conclusions of doctors who had examined him after the offense. Second, and more importantly, the *Rainey* court based its conclusion in part on the fact that, in that case, it had defense counsel's "frank admission" that he had "misconstrued the law" when counsel stated that if he had raised an insanity defense, it would have been an admission that the defendant committed the acts. *Id*. at 330-31.

¶ 72    Here, we have defense counsel's statement that he thought a finding of GBMI would still be appropriate even though he had not raised an insanity defense, which is clearly not the law, but we also have defense counsel's reasonable explanation for why he did not raise the

defense. At a status hearing prior to trial, the trial court questioned whether defense counsel would be raising an insanity defense. Defense counsel explained that Wood had been examined by an expert but he would not be submitting a report from that expert. Defense counsel further explained that he had been "toying" with the idea of having Wood examined by another doctor but Wood had informed him that he would refuse to cooperate with any other examinations. At the hearing on his motion for a new trial, defense counsel informed the trial court that he had not raised an insanity defense because he did not have an expert who would testify that Wood was insane at the time of the offense and because he did not want to allow the State to hire its own expert to examine Wood and have access to Dr. Hanlon's findings.

¶ 73    The *Rainey* court's conclusion that trial counsel provided ineffective assistance appears to be two-fold. We do not believe that the testimony of the expert alone, who testified at the sentencing hearing just as Dr. Hanlon did here that the defendant in *Rainey* was not insane, would have been sufficient evidence to support raising an insanity defense in that case. The *Rainey* court's explanation for why counsel provided ineffective assistance also included trial counsel's explanation that the only reason he did not raise the defense is that he thought it would constitute an admission of guilt. Although *Rainey* was silent on this issue, we believe trial counsel in that case would also have had to obtain some evidence that the defendant in *Rainey* was insane at the time of the offense in order to plead insanity in good faith.

¶ 74    Here, Wood does not explain how his trial counsel could have proceeded on an insanity defense in good faith, but simply states that, having decided to argue GBMI, "it was counsel's professional obligation to assert that defense in a way that conformed to statutory requirements, and then to substantiate the defense with a readily available witness." As an initial matter, we note that GBMI is not a defense. See 720 ILCS 5/6-4 (West 2010) ("mental illness is not an affirmative defense, but an alternative plea or finding"). To obtain a finding of GBMI, a defendant has only two options: a defendant may enter a plea of guilty but mentally ill, either before or during trial (725 ILCS 5/115-2(b) (West 2010)); or a defendant may raise the defense of insanity and, if he fails to establish insanity but proves by a preponderance of the evidence that he was mentally ill at the time of the offense, he may be found guilty but mentally ill (725 ILCS 5/115-3(c)(1)-(3) (West 2010)).

¶ 75    Under Illinois law, all people are presumed sane and, in order to raise the affirmative defense of insanity, a defendant must present some evidence of insanity. *People v. Silagy*, 101 Ill. 2d 147, 168 (1984). See also 720 ILCS 5/3-2(a) (West 2010) (to raise an affirmative defense, a defendant must present some evidence thereon). A person is insane and not criminally responsible for his conduct if he lacks substantial capacity to appreciate the criminality of that conduct due to a mental disease or defect. 720 ILCS 5/6-2(a) (West 2010).

¶ 76    Here, Wood's own expert concluded that Wood understood the criminality of his actions. This conclusion is supported by the substantial evidence presented at trial regarding Wood's ability to appreciate the criminality of his conduct, including his anger at his mother for obtaining the protective order, which rendered him homeless, his desire to prevent his mother from informing the police of his violation of the protective order, his conduct in faxing an explanation for his mother's absence from work and his conduct in fleeing and eluding police after his mother's body was discovered. Wood's counsel explained to the court that he was considering having Wood examined by another expert, but Wood had informed him that he would not cooperate with any other doctors. In light of the fact that his own expert determined that Wood was not insane at the time of the offense and Wood refused to be examined by any

other doctors, defense counsel clearly could not have "substantiated [an insanity] defense with a readily available witness."

¶ 77 Moreover, an attorney must sign every pleading, motion or other document entered on behalf of a party he is representing, and his signature constitutes a certification that, to the best of his knowledge, information and belief formed after reasonable inquiry, it is well grounded in fact and is warranted by existing law. Ill. S. Ct. R. 137(a) (eff. July 1, 2013). Further, the Rules of Professional Conduct provide "[a] lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good-faith argument for an extension, modification or reversal of existing law." Ill. R. Prof. Conduct (2010) R. 3.1 (eff. Jan. 1, 2010). Defense counsel's conduct in asserting an insanity defense in light of Dr. Hanlon's opinion that Wood was not insane at the time he murdered his mother would have constituted a violation of the foregoing ethical constraints. We cannot conclude that defense counsel's failure to pursue a defense for which he lacked an adequate factual and legal basis constitutes ineffective assistance.

¶ 78 We note that the facts of this case highlight a problem with the underlying statute. In cases such as this, a defendant is precluded from obtaining a finding of GBMI even where it would clearly be appropriate because such a finding requires raising an insanity defense in the absence of any supporting evidence. But we cannot set a standard of conduct that requires lawyers to plead a defense that is not supported by a good faith belief in its factual and legal viability. Correcting this defect in the statute is a matter for the legislature. Although we believe that a finding of GBMI would have been appropriate here, we cannot say that counsel provided ineffective assistance in deciding not to pursue a statutorily required defense for which he did not have and could not obtain any supporting evidence.

¶ 79 For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 80 Affirmed.