NO. 4-05-0942          Filed 5/24/07

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS,      )   Appeal from
          Plaintiff-Appellee,             )   Circuit Court of
          v.                              )   Macon County
DAVID E. MANNS,                           )   No. 04CF912
          Defendant-Appellant.            )
                                          )   Honorable
                                          )   Scott B. Diamond,
                                          )   Judge Presiding.
_____

          JUSTICE KNECHT delivered the opinion of the court:

          Defendant, David E. Manns, was charged by information

with one count of aggravated robbery (720 ILCS 5/18-5(a) (West

2004)).  The trial court found him unfit to stand trial.  The

trial court later held a discharge hearing and found the evidence

was sufficient to convict defendant of the charges.  Defendant

appeals from this finding, arguing (1) the evidence demonstrated

he was insane at the time of the offense and (2) his trial

counsel was ineffective in not raising an insanity defense to the

charges.  We reverse and remand.

I. BACKGROUND

          The charges against defendant were based on his conduct

on the morning of August 3, 2004, in which he took $100 from

Alisha Myers, a teller at Prairie State Bank, by stating he had a

gun.  On August 18, 2004, the day set for defendant's preliminary

hearing, the trial court ordered a fitness evaluation upon motion

of defense counsel.  At that hearing, the following exchange occurred:

> "[DEFENDANT]: I'm--I'm American president and.
>
> THE COURT: Speak a little more slowly.
>
> [DEFENDANT]: I'm an American president.
> And talking to a lawyer--and talking to a lawyer, the bank I robbed was my bank ***."

The trial court told defendant they would discuss that after he was seen by Dr. Cuddeback.

Dr. Georgia Cuddeback, a psychologist for the Rock Springs Family Medical Center, examined defendant on August 23, 2004, to determine his fitness to stand trial.  She found his "speech was so rapid and pressured as to be nearly unintelligible.  He was also observed to yawn and to giggle inappropriately. [Defendant] was delusional throughout the evaluation."  Defendant maintained he wrote movies and songs that had been stolen from him and he was attempting to take his cases to court.  He stated he had been to Hollywood and acted in movies.  Defendant denied auditory hallucinations, although his mother stated he hears voices.  He was unable to recall his attorney's name but knew he was charged with aggravated robbery. Defendant was aware of the possible penalties upon conviction of the charge against him and was aware of the roles of various court officers.

Dr. Cuddeback noted defendant had a history of psychiatric admissions to five different psychiatric centers or hospitals. He had a lengthy history of mental illness, most likely schizophrenia, paranoid type. His thought disorder is characterized by persecutory and grandiose delusions, hallucinations, and paranoia. Dr. Cuddeback found while defendant was aware of the charges against him, he had no appreciation for the seriousness of the alleged act. She found he was unable to assist his attorney in his defense and was unfit to stand trial. Dr. Cuddeback also found defendant to be inappropriate for independent living because his illness rendered him incapable of conforming his conduct to acceptable standards.

On September 8, 2004, the trial court considered Dr. Cuddeback's report and found defendant unfit to stand trial but likely to be found fit within one year. Defendant was remanded to the custody of the Department of Human Services.

On October 15, 2004, Dr. Tyrone Hollerauer, clinical psychologist at McFarland Mental Health Center, evaluated defendant's fitness to stand trial. Dr. Hollerauer found defendant was aware of the charges against him and knew he was being evaluated for his fitness to stand trial. Defendant's speech was rapid and his description of events leading to his arrest was almost incoherent. Dr. Hollerauer found defendant to be of average intelligence and his memory to be intact but tainted by psychosis. Defendant could not understand how he

could go to prison because he was just trying to make a point about the bank stealing his ideas.

Dr. Hollerauer further found:

"Persecutory ideas are vaguely noted in that people try to take his fame and wealth. His delusions tend to be grandiose in nature. He believes he is extremely intelligent and has an 'IQ of 354.' He also reports having studied medicine and wanting to become a doctor. [Defendant] felt that the name of the bank he allegedly robbed was an idea of his when he was in high school. He reasons that the bank's use of this idea was tantamount to stealing from him. He thus concluded that he deserves some ownership in the bank. [Defendant] also reports that he has authored books and songs that others have taken credit for."

Dr. Hollerauer diagnosed defendant with schizoaffective disorder, bipolar type, and found he remained unfit to stand trial although he was making progress toward attaining fitness within one year. On November 18, 2004, the trial court found defendant still unfit to stand trial.

On January 6, 2005, Dr. Hollerauer again evaluated defendant for fitness. Dr. Hollerauer found defendant to be

"floridly psychotic and unstable psychiatrically" and still unfit to stand trial. Defendant did not accept counseling and was delusional and grandiose. He believed himself to be a lawyer and a doctor and refused to deal with professionals trying to educate him. Defendant claimed the name of the bank was a name he thought of in high school and concluded "they" stole "[his] bank." Dr. Hollerauer noted defendant stated "He was trying to get everybody's attention 'by showing them that he had a right to take money from his own bank.'"

Further, defendant would not talk about his mental illness and did not believe he had a mental illness. He was at that time gravely ill and noncompliant with attempts to treat him for renal failure. Although he gave his mother power of attorney, he specified dialysis cannot be administered even to save his life. On February 17, 2005, the trial court found defendant still unfit to stand trial.

On February 18, 2005, the trial court received correspondence from defendant that stated he was a student lawyer and student doctor and "this case is a strange one, because the bank I robbed is in fact a bank as I am, also a young entrepenueur [sic], or businessman thought of as an idea to prosper myself, but the idea for the bank (the Prairie State Bank) was somehow stolen."

On April 1, 2005, Dr. Hollerauer again evaluated defendant for fitness. Defendant had reduced spontaneous

reporting of delusional ideas although he was still grandiosely delusional at times. His physical condition remained serious but stable. Defendant appeared to be responding to medication psychologically, and his impulse control was improving. He was willing to take psychotropic medication but did not fully cooperate with medical care for his renal failure. Dr. Hollerauer found defendant still not able to cooperate with counsel and understand the judicial process but found he was making progress toward attaining fitness. On May 16, 2005, the trial court found defendant was still unfit to stand trial.

On July 14, 2005, Dr. Hollerauer again evaluated defendant. Defendant denied hallucinations but was unreliable as a historian and was openly paranoid and grandiose. He believed he was well-educated and wealthy and felt angry and victimized when his renal diet was enforced. He threatened to kill a case manager and nurse because he could not obtain what he wanted. Defendant continued to take psychotropic medication although he had no insight into his mental illness. His mood was hostile. Dr. Hollerauer found defendant was unable to cooperate with defense counsel and did not understand the judicial process. Further, he was no longer making progress toward attaining fitness within one year.

A status hearing was set for September 15, 2005. Defendant attended the hearing and told the court he was a "true genius" and he had been trying to attend Southeast School in

- 6 -

Decatur since he was three, his mother would not let him finish college, his high school grade average was a C but "people kept psyching out--psyching me out about my grades, lowering my grades." Defendant asked for a discharge hearing. A discharge hearing was set for November 8, 2005.

On October 12, 2005, defendant was evaluated again for fitness. Dr. Hollerauer found defendant's insight into his mental illness was poor:

> "He does not believe he has a mental illness
> ***. He denies hallucinations and
> depression. He is delusional and continues
> to report grandiose ideas of wealth and
> special knowledge of the law and medicine.
> The belief that he owns the bank he allegedly
> robbed persists. *** His thoughts are
> illogical and at times incoherent."

Dr. Hollerauer concluded defendant remained unfit and was not making progress toward attaining fitness within the one-year requirement.

On November 8, 2005, the trial court held a discharge hearing. Neither defense counsel nor the prosecutor offered an opening statement. Alisha Myers testified on the morning of August 3, 2004, defendant approached her window and told her to give him some money or he would shoot her. At first Myers did not understand what defendant was saying and asked him to repeat

himself. Defendant's hands were not visible and she believed he had a gun. As Myers proceeded to get some money, defendant stated he did not want much, just give him $100. Myers gave defendant the $100 and he gave her his identification (ID) card and said he used to own the bank and it was taken from him. After defendant walked out of the bank, Myers called the police. Myers identified the picture on the ID card and defendant as the man to whom she gave the $100.

On cross-examination, Myers restated defendant said he only wanted $100 and the bank had been stolen from him. She stated that was all defendant said as he walked out. Myers also stated within 30 minutes after the incident, the police took her to defendant's home to identify him.

Brian Cleary, a Decatur police officer, testified he responded to a call about a robbery at Prairie State Bank on August 3, 2004. He spoke with Myers, who gave him an ID card of the suspect. The ID was a veteran's universal access identification card with a picture in the right-hand corner of defendant. After determining his location, Cleary went to defendant's home, where defendant identified himself. Defendant stated he knew why Cleary was there, removed his right shoe, took out a $100 bill, and gave it to Cleary. Defendant told Cleary he had just gotten the $100 bill from Prairie State Bank. Myers identified defendant as the person who had robbed her.

After Cleary read defendant his Miranda rights (Miranda

v. Arizona, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966)), defendant stated he wanted to talk to Cleary without his attorney present.  Cleary said defendant told him the following:

> "[H]e wanted to get caught.  He went there to rob the bank.  He said that he asked her for a $100.00 [sic].  He told her that he would shoot her and pretended like he had a gun so that she would give him his money.  He told me that he threw his ID down on the counter because he wanted to get caught because he wanted to go talk to the judge so the judge would give him back his bank.  He had indicated that when he was in high school, he had the idea to open the bank and that the president of the bank had stolen the idea from him; so, he wanted the bank back.
>
> * * *
>
> *** [H]e went on to speak about, he wrote the movie--uh--Fatal Attraction, and used the name, Michael Douglas.  He said that Michael Douglas stole the name of the movie from him.  He indicated that he had grown up across the street--uh living on Whitmer Street, here in Decatur, across the street from President Clinton and that President

- 9 -

Clinton got to be President by causing him, [defendant,] pain. Said that President Clinton, also, caused him to use heroin and that Mr.--or President Clinton moved to Harlem now because Harlem is Heroin City. He further made statements about his mother having him admitted to Adolf Myers when he was 18, that he had joined the Marine Corps, and that another marine had him discharged by causing him pain in his head."

Defense counsel did not cross-examine Cleary. Defense counsel did not offer any evidence on behalf of defendant and declined closing argument. The State argued it proved beyond a reasonable doubt that defendant committed the charged offense.

The trial court found the hearing did not result in an acquittal of defendant and remanded him to the custody of the Department of Mental Health and Developmental Disabilities (Department) for further treatment for a period not to exceed two years, the statutory maximum (see 725 ILCS 5/104-25(d)(1) (West 2004)), and ordered the Department to submit reports to the court every 90 days on defendant's fitness to stand trial.

This appeal followed.

## II. ANALYSIS

A defendant who has been found unfit to stand trial is entitled to a discharge hearing if he remains unfit after one

- 10 -

year from the original finding of unfitness. 725 ILCS 5/104-23(a), 104-25 (West 2004). A discharge hearing under section 104-25 is an "innocence only" proceeding to determine whether a defendant is entitled to a judgment of acquittal. The purpose of the hearing is not to make a determination of guilt. People v. Waid, 221 Ill. 2d 464, 469-70, 851 N.E.2d 1210, 1213-14 (2006). The question of guilt is deferred until a defendant is fit to stand trial. People v. Rink, 97 Ill. 2d 533, 543, 455 N.E.2d 64, 69 (1983).

At a discharge hearing, the trial court may make one of three findings. First, the court could find the State has carried its burden of proof in providing evidence by which the defendant may be proved guilty beyond a reasonable doubt. Second, the court may acquit the defendant. Finally, the court may acquit the defendant based on a finding the defendant is not guilty by reason of insanity. 725 ILCS 5/104-25(a), (b), (c) (West 2004).

The Criminal Code of 1961 provides "[a] person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity to appreciate the criminality of his conduct." 720 ILCS 5/6-2(a) (West 2004). When the defense of insanity is presented at trial, the defendant has the burden of proving by clear and convincing evidence he is not guilty by reason of insanity. 720 ILCS 5/6-2(e) (West 2004).

A. Evidence at Discharge Hearing

Defendant first contends there was ample evidence in the record at the discharge hearing to find he was legally insane at the time of the alleged aggravated robbery. After a bench trial, a determination of sanity will not be reversed unless it is so improbable or unsatisfactory as to create a reasonable doubt of defendant's sanity. People v. Hoots, 228 Ill. App. 3d 42, 53, 592 N.E.2d 483, 491 (1992). This was a discharge hearing, however, and when the trial court entered its judgment, there was no indication the court considered the question of defendant's sanity.

The trial court had the benefit of testimony by both Myers and Officer Cleary as well as evaluations made by psychiatric professionals as to defendant's progress during the year he was an inpatient with the Department of Human Services in an attempt to make him fit to stand trial. Evidence was presented that could have supported a finding of insanity at the time of the offense because defendant had a lengthy history of mental illness.

Insanity is an affirmative defense that must be raised by the defendant. People v. Fosdick, 166 Ill. App. 3d 491, 499, 519 N.E.2d 1102, 1108 (1988). Defendant also bears the burden of proving it by clear and convincing evidence. See 720 ILCS 5/6-2(a), (e), 3-2 (West 2004). Although evidence in the record might have supported the defense of insanity, it was not raised

by defendant.  The trial court did not err in failing to make a finding on that issue under these circumstances.

B. Ineffectiveness of Counsel for Not Raising Insanity Defense

To prevail on a claim of ineffective assistance of counsel, a defendant ordinarily must show (1) counsel's performance was deficient and (2) this deficient performance prejudiced the defense.  Strickland v. Washington, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984).  To establish prejudice, a defendant must show there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Strickland, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Strickland, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.  A reviewing court must focus on the fundamental fairness of the proceeding and consider "whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results."  Strickland, 466 U.S. at 696, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

Under certain circumstances, prejudice may be presumed.  Where defense counsel fails to subject the prosecution's case to meaningful adversarial testing, the adversary process is presumptively unreliable.  Unites States v. Cronic, 466 U.S. 648,

- 13 -

658-59, 80 L. Ed. 2d 657, 667-68, 104 S. Ct. 2039, 2046-47 (1984).

The facts in this case are similar to those in People v. Young, 220 Ill. App. 3d 98, 581 N.E.2d 371 (1991), where the court found defense counsel ineffective for failing to raise an insanity defense at a discharge hearing. In Young, the defendant was charged with armed violence, intimidation, and unlawful use of weapons and was found unfit to stand trial. Young, 220 Ill. App. 3d at 99, 581 N.E.2d at 373. At his discharge hearing, defense counsel presented a defense based on the theory a conviction of armed violence would be an improper double enhancement of an intimidation conviction. Young, 220 Ill. App. 3d at 107, 581 N.E.2d at 379. Defense counsel put on no witnesses and engaged in minimal cross-examination and argument. Further, the court found counsel had put on a defense that was unsound as a matter of law. Because the defendant did not express a wish to concede guilt, defense counsel had not subjected the prosecution's case to meaningful testing. Young, 220 Ill. App. 3d at 107-08, 581 N.E.2d at 379. The court found because counsel failed to subject the prosecution's case to meaningful adversarial testing, the result of the discharge hearing may be presumed to be unreliable. Young, 220 Ill. App. 3d at 107, 581 N.E.2d at 378-79.

As the court noted in Young, if no bona fide defense existed, defense counsel would not be ineffective for not raising

- 14 -

one. Young, 220 Ill. App. 3d at 108, 581 N.e.2d at 379. But the argument the defendant was insane at the time of the offense "was not so lacking in merit as to make it objectively reasonable for defense counsel to forego any meaningful attempt to raise it." Young, 220 Ill. App. 3d at 108, 581 N.E.2d at 379. The defendant there had been examined by a number of experts who unanimously concluded he suffered from delusional thinking and paranoia and had a history of psychological disorders. Further, his thinking was found to be in line with a person suffering persecutory delusions. Young, 220 Ill. App. 3d at 108, 581 N.E.2d at 379. The court concluded, even if no witnesses were called on the issue of insanity, there was no reason counsel could not have at least attempted to incorporate the evidence on the defendant's mental health already of record, and it remanded for a new discharge hearing. Young, 220 Ill. App. 3d at 108-09, 581 N.E.2d at 379-80.

The same result is warranted here. The finding defendant was unfit to stand trial and remained unfit was not proof of insanity at the time of the offense (People v. Britton, 119 Ill. App. 2d 110, 113, 255 N.E.2d 211, 212-13 (1970)); however, the accounts of defendant's behavior at the time of the offense, statements he made in court, and his fitness evaluations demonstrate he was delusional at the time of the offense and lend support to the defense he was unable to appreciate the criminality of his conduct.

- 15 -

Myers testified she was unable to understand defendant at first, and in an evaluation only 20 days later, defendant's speech was found to be "so rapid and pressured as to be nearly unintelligible"; his description of events leading to his arrest "almost incoherent." At those early evaluations, defendant was found to have "no appreciation for the seriousness of the alleged act." He was found to be delusional with probable hallucinations and had deficits in memory, abstract reasoning, and judgment. Defendant's delusions were illustrated in his belief he owned the bank in question or it had been stolen from him, and he was, therefore, entitled to withdraw money from it. The trial court had the benefit of testimony by both Myers and Officer Cleary as well as evaluations made by psychiatric professionals as to defendant's progress during the year he was an inpatient with the Department of Human Services in an attempt to make him fit to stand trial. Defendant thought his conduct would be excused because he believed he "owned the bank."

Yet defense counsel only cross-examined Myers as to verify defendant only wanted $100 and said the bank had been taken from him. He did not cross-examine Cleary at all. He did not offer additional evidence other than defendant's own testimony. While the State argued it was proved beyond a reasonable doubt defendant committed the offense charged, defense counsel offered no argument at all. He did not suggest the court acquit defendant by reason of insanity. An insanity defense in

this case had merit, and it was objectively unreasonable to forego presenting the defense. Like the defendant in <u>Young</u>, defendant was examined by more than one expert who concluded he suffered from delusional thinking and paranoia. Dr. Cuddeback also opined defendant had "no appreciation for the seriousness of the alleged act."

Based on the bizarre nature of the offense and defendant's psychological evaluations, his conduct was more in line with a person suffering persecutory delusions than a rational man. Counsel could have presented evidence or argued in closing, based on the evidence already before the court, that defendant should be acquitted by reason of insanity. Defense counsel's failure to do so results, as in <u>Young</u>, in a presumption of prejudice and renders the result of the discharge hearing unreliable.

Actual prejudice existed here where an insanity defense was reasonable based on the evidence in the record and it is the <u>only</u> viable defense defendant had. Defendant suffered actual prejudice because defense counsel failed to present the only viable defense available to him. We express no opinion on the likelihood of success. The definitions of insanity and fitness differ. The question of insanity focuses on the mental state of the defendant at the time of the offense. The question of fitness focuses on the mental state of the defendant at the time of trial or preparation for trial. However, this defendant's

mental state just 22 days after the alleged offense coupled with his history of mental illness and his bizarre conduct and statements on the day of the offense bespeak the merits of the defense.  While facing a formidable challenge due to the burden of proof, defense counsel was ineffective for failing to mount a challenge to the State by presenting the defense of insanity.

## III. CONCLUSION

For the foregoing reasons, we reverse the trial court's judgment and remand the cause.

Reversed and remanded.

APPLETON and McCULLOUGH, JJ., concur.