NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230617-U

NO. 4-23-0617

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 8, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McDonough County |
| ALISON MORROW, | ) | No. 21CF148 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Raymond A. Cavanaugh, |
| | ) | Judge Presiding |

_____

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Zenoff and DeArmond concurred in the judgment.

### ORDER

¶ 1    *Held:*    The appellate court affirmed the trial court's finding defendant "not not guilty" of (1) possession of lost or mislaid credit or debit cards and (2) theft of lost or mislaid property.

¶ 2    In August 2021, defendant, Alison Morrow, was charged with (1) one count of possession of lost or mislaid credit or debit cards, a Class 4 felony (720 ILCS 5/17-33 (West 2020)), and (2) one count of theft of lost or mislaid property, a Class B misdemeanor (*id.* § 16-2(d)(1)).

¶ 3    In January 2022, following a fitness hearing, the trial court found that defendant was not fit to stand trial. In June 2023, the court conducted a discharge hearing pursuant to section 104-25 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/104-25 (West 2022)), at which it found defendant "not not guilty" of the charges against her and ordered her remanded into the custody of the Illinois Department of Human Services (IDHS) for an

additional 15 months of treatment.

¶ 4 Defendant appeals, arguing that defense counsel was ineffective for failing to raise and present an insanity defense, which defendant contends was the only viable defense to the charges against her. We disagree and affirm.

¶ 5 I. BACKGROUND

¶ 6 A. The Charges

¶ 7 In August 2021, defendant was arrested and charged with (1) one count of possession of lost or mislaid credit or debit cards and (2) one count of theft of lost or mislaid property.

¶ 8 That same month, at defendant's initial appearance in the trial court on these charges, the State provided the following factual basis for defendant's arrest. Erica Stewart reported to the Macomb Police Department that her wallet had been stolen and she had noticed several unfamiliar transactions on her credit card at various stores in Macomb, Illinois. Macomb police officers investigated those locations and determined that defendant was the culprit. The officers then found and arrested defendant, finding in her possession Stewart's property, as well as the items defendant had purchased with Stewart's credit card.

¶ 9 While the State was presenting the factual basis, defendant interjected: "Can I tell you what happened to me? I had a bad affect [*sic*] from my meds is what happened, and I didn't want to do anything controllably bad because I don't even care about—I didn't want to do it." The trial court informed defendant that it was merely addressing bond at the moment, and the hearing continued without further incident.

¶ 10 The trial court accepted the factual basis and found probable cause for defendant's arrest.

¶ 11                                    B. Defendant's Fitness Hearing

¶ 12          In October 2021, defense counsel filed a motion for a fitness evaluation, stating that he "has represented [defendant] since the inception of this case and has had numerous contacts with [defendant], and has had contact with her caseworker through Bridgeway" and he "believes that there is a legitimate question as to the ability of [defendant] to observe, recollect, and relate the occurrence of the incidents alleged, which creates a *bona fide* question as to [defendant's] fitness." By agreement of the parties, the trial court ordered a fitness examination.

¶ 13                                    1. *The Fitness Evaluation and Report*

¶ 14          In November 2021, Dr. Joel Eckert examined defendant and concluded that she was unfit to stand trial but was likely to attain fitness within one year. Eckert reviewed defendant's medical history and noted in his report that she had a "variety of psychiatric difficulties," including schizophrenia, alcohol use disorder, and marijuana use disorder. She also had "a history of 20 previous psychiatric hospitalizations" and experienced hallucinations and cognitive disorganization. She had tried several different antipsychotic medications and, as of January 2021, had been prescribed an antipsychotic medication.

¶ 15          Dr. Eckert noted that defendant's medical file contained a case note from a meeting she had with her psychiatrist in September 2021, after her arrest. The psychiatrist wrote that defendant appeared disorganized and disheveled. When the psychiatrist asked defendant about the criminal charges, she explained that "she blacked out and does not remember the event and that she went and got the wallet." Defendant blamed her medication for her actions. However, the psychiatrist explained to defendant that the medication would not make her steal a wallet and do what she had done. Defendant denied experiencing auditory or visual hallucinations. She also denied smoking marijuana or drinking on a regular basis, but she had

been found smoking marijuana outside multiple times.

¶ 16    Before interviewing defendant, Dr. Eckert began the assessment by interviewing defendant's caseworker, Marcus Follis, who had transported defendant to the interview. Follis had known defendant for three to four months. Eckert asked Follis why defendant had been referred, and Follis said, "because of a criminal offense—and she had stolen credit cards out of a nursing home and bought things with them and this is not the first time she's searched for cigarette butts and has stolen from cards." Follis reported that "she has in the past admitted that she knew exactly what her offense was and knew that what she had done was 'wrong'. On other occasions she had reportedly claimed total innocence, 'because she said she blacked out.' " That sort of behavior had occurred for several years.

¶ 17    During Dr. Eckert's interview with defendant, she stated the following when asked about why she was referred to the assessment, "I'm here—what I'm saying is I had a type of problem—I'm only taking a little shot for disability and the other day I fell back and I couldn't concentrate and it was a bad medicine attack!" Eckert again asked defendant if she knew why she had been referred to him for the evaluation. Defendant answered, "I'm here to talk about what happened—I don't remember what happened and I spent time (in jail), and it's all due to a near fatal car accident in the 90's!" He asked if defendant could name the charges against her. Defendant answered, "I was charged with some kind of theft, and I don't even remember!" Eckert asked her to try to remember, to which she replied, "[T]hey said it was someone else's wallet. *** I was all moozed out and was reaching for my wallet and I had to sit down, and someone asked me what I was doing." Defendant claimed that the charges were due to "a misunderstanding" and that "legal misunderstandings" have periodically occurred to her in the past. Regarding how she spent her free time, defendant reported to Eckert, "I rest a lot and I

- 4 -

don't have money to do what I want (to do)!" Later in the interview she again complained, "I have no money to do anything!"

¶ 18                    2. *The Fitness Hearing*

¶ 19        In January 2022, the trial court conducted a fitness hearing. The only evidence presented at the hearing and considered by the court was Dr. Eckert's report containing his opinion regarding defendant's fitness. The State asked the court to find defendant unfit but likely to attain fitness in one year. The court agreed with the State, stating as follows:

> "All right. I will—based on the evidence before the Court, I will find [defendant], to be unfit to stand trial. I further find that based on that same evidence that fitness could be restored in one year, and she would, once a plan is in place for treatment, be remanded to a DHS facility to regain fitness. I will allow [defendant] to remain out on bond pending that placement."

¶ 20                    3. *The Subsequent Proceedings*

¶ 21        In February 2023, Elgin Mental Health Center, where defendant was receiving mental health treatment, produced a report regarding defendant's fitness. In that report, the center's staff reported that defendant did not believe she had done anything wrong and that she had only "mozzed out." The report provided that defendant's remote and recent memory appeared intact because she could recall her personal history and the details of her arrest. However, the report explained that when defendant was symptomatic, she was "a poor historian" and exhibited delusional thought patterns, especially concerning the charges and events leading to her arrest. Further, defendant said that she no longer had to go to court because of "time served already" and she was "already found innocent due to insanity." The report concluded that defendant remained unfit. In April 2023, an addendum was added to the report opining that

- 5 -

defendant was still unfit as of that date.

¶ 22                    C. The Discharge Hearing

¶ 23        In June 2023, the trial court conducted a discharge hearing.

¶ 24                         1. *Erica Stewart*

¶ 25        Erica Stewart testified that on August 12, 2021, she worked at Macomb Post Acute Care Center in Macomb. During her shift, she took a smoke break and went to the designated smoking area on the center's property. After returning to work, she realized that she had forgotten her "cigarette pack," which contained credit cards, gift cards, and her driver's license, outside at the smoking area. When she went out to the smoking area to retrieve her wallet, she was unable to find it, and none of her coworkers had seen the wallet. At that point, Stewart suspected that someone had taken it. She then checked her credit card statement online and noticed multiple transactions at various locations around town. Although at the time she did not know defendant's name, she recognized defendant as the most likely suspect because defendant frequently came over to the smoking area to take cigarette butts out of the ashtray. Stewart called the police and relayed this information to the officers.

¶ 26                         2. *Malik West*

¶ 27        Malik West testified that on August 12, 2021, he worked at Walgreens in Macomb and had checked defendant out at the cash register. Defendant tried to purchase "something small" and tried to get cash back from the purchase. West said, "I remember, she would try to put a [personal identification number (PIN)] in or she was very insistent on trying to get cash out or cash back." A couple hours after she had left the store, police officers came in and asked if there was "somebody that came in trying to make a purchase." West said yes.

¶ 28        The prosecutor then played for West the video surveillance footage from the

transaction, which West stated showed defendant's multiple attempts to use the cash back option on the card reader. West explained that he remembered her failing to get cash back because she did not appear to know the PIN for the card. He further stated that defendant had made three purchases, wanting cash back each time.

¶ 29          On cross-examination, West testified that he did not see the name on the credit card that defendant used for the purchases.

¶ 30                               *3. Denise Cremer*

¶ 31          Denise Cremer testified that on August 12, 2021, she was working as a police officer for the Macomb Police Department and investigated Stewart's report of a stolen wallet. As part of the investigation, Cremer spoke with Stewart, who told her that the most recent transaction on the credit card was at Walgreens. Cremer went to the store and spoke with West. She also obtained surveillance footage of the store register from that day and printed copies of the transactions from that day, which were admitted into evidence.

¶ 32          Cremer identified defendant as a suspect and went to her residence at Bridgeway Home in Macomb, which was located behind Macomb Post Acute Care Center. There, Cremer met with defendant in the office of the building. Defendant was wearing the same outfit that Cremer had observed her wearing in the surveillance footage. Cremer first asked defendant if she would cooperate to get Stewart's items back to her. Defendant agreed to cooperate and led Cremer to her room, where she saw the items that defendant had purchased with the credit card. Cremer told defendant that she should cooperate because Cremer had video of her making the purchases at Walgreens. Defendant then handed Cremer the wallet, which she produced from a bookbag in the room.

¶ 33          Defense counsel and the prosecutor both waived closing argument.

¶ 34                               4. *The Trial Court's Decision*

¶ 35          The trial court found defendant "not not guilty" of the charges against her and ordered her remanded into the custody of IDHS for an additional 15 months of treatment.

¶ 36          After the trial court delivered its judgment and admonished defendant "to do [her] part" in becoming fit to stand trial, defendant stated:

> "That's what I mean. See, the thing was, this was a big misunderstanding because I picked—I had—I found the wallet, right, and I wasn't going to use it, I went into a—up to the Dollar Tree *** It was a mistake and a misunderstanding because I didn't want to go through the line. The woman had me go through the line because she didn't know what to do to get a receipt or anything else in order to do her job. But she said she hadn't taken her pills. She said she was sorry about it and that's all."

¶ 37          This appeal followed.

¶ 38                               II. ANALYSIS

¶ 39          Defendant appeals, arguing that her trial counsel was ineffective for failing to raise and present an insanity defense, which defendant contends was the only viable defense to the charges against her. We disagree and affirm.

¶ 40                          A. The Applicable Law

¶ 41                          1. *Ineffective Assistance*

¶ 42          To succeed on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced the defendant. *People v. Veach*, 2017 IL 120649, ¶ 30, 89 N.E.3d 366 (quoting *People v. Domagala*, 2013 IL 113688, ¶ 36, 987 N.E.2d 767, citing

*Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "Specifically, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Internal quotation marks omitted.) *Id.* "A reasonable probability is defined as a probability sufficient to undermine confidence in the outcome." (Internal quotation marks omitted.) *Id.* "A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy [either] of the prongs precludes a finding of ineffectiveness." *Id.*

¶ 43                    2. *Defendant's Fitness To Stand Trial and the Insanity Defense*

¶ 44            A discharge hearing pursuant to section 104-25 of the Code (725 ILCS 5/104-25 (West 2022)) is not a criminal prosecution. "[Instead], it is an innocence-only hearing that is civil in nature and simply enables an unfit defendant to have the charges dismissed if the State does not have the evidence to prove [s]he committed the charged offenses beyond a reasonable doubt." (Internal quotation marks omitted.) *People v. Cardona*, 2013 IL 114076, ¶ 23, 986 N.E.2d 66.

¶ 45            A defense based on insanity is available at a discharge hearing and operates to acquit the defendant of the charges against her. 725 ILCS 5/104-25(c) (West 2022). A defendant is not guilty by reason of insanity "if at the time of such conduct, as a result of mental disease or mental defect, [s]he lacks substantial capacity to appreciate the criminality of [her] conduct." 720 ILCS 5/6-2(a) (West 2020). A defendant bears the burden to prove by clear and convincing evidence that she is not guilty by reason of insanity. *Id.* § 6-2(e).

¶ 46                              3. *The Standard of Review*

¶ 47            When asserting claims of ineffective assistance of counsel, a defendant "must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy." *People v. Smith*, 195 Ill. 2d 179, 188, 745 N.E.2d 1194, 1200 (2000). A

defendant may overcome that presumption if counsel's decision appears so irrational and unreasonable that no reasonable defense attorney facing similar circumstances would pursue such a strategy. *People v. Jones*, 2012 IL App (2d) 110346, ¶ 82, 982 N.E.2d 202. Defendant bears the burden to show that defense counsel's performance was deficient and prejudicial. *Smith*, 195 Ill. 2d at 188.

¶ 48                                    B. This Case

¶ 49         Defendant argues that, given the (1) "ample evidence in the record supporting the conclusion that [defendant], due to her mental condition, lacked the substantial capacity to appreciate the criminality of her conduct" and (2) lack of any alternative viable defense, defense counsel was "obligated to pursue [an insanity] defense by requesting a sanity evaluation, by pleading [that defense] before the [trial] court, and raising it during the discharge hearing." Defendant points out, among other things, the following evidence in the record that supports her position: (1) she had a history of mental illness and had been prescribed antipsychotic medications at the time of the offense, (2) during and after her commission of the offense, she made no effort to hide her identity or cover up her crime, and (3) multiple fitness evaluations conducted after her arrest not only demonstrated that she was unfit to stand trial but also wholly supported an insanity defense.

¶ 50         In essence, defendant puts the following question before this court: Is the evidence of defendant's insanity in this case so strong that it demonstrates counsel's performance was deficient given the absence in the record of (1) a request for a sanity evaluation or (2) a discussion of the insanity defense? We conclude it does not. Because we conclude that defense counsel's performance was not deficient, we address only that issue. See *People v. Henry*, 2016 IL App (1st) 150640, ¶ 53, 58 N.E.3d 813 ("We do not need to consider the remaining prong of

- 10 -

the *Strickland* test if one prong cannot be satisfied.").

¶ 51        As an initial matter, we emphasize that "[j]udicial review of counsel's performance is highly deferential." *People v. Bates*, 2018 IL App (4th) 160255, ¶ 47, 112 N.E.3d 657. Baked into that deference are four presumptions. First, we presume that counsel's actions or inactions are the product of sound trial strategy. *Id.* Second, we presume that counsel knew the law and how to apply it. *People v. Boyd*, 2021 IL App (1st) 182584, ¶ 64, 197 N.E.3d 200. Third, we presume that counsel fully investigated potential defenses and knew the facts of the defendant's case. See *People v. Ressa*, 2019 IL App (2d) 170439, ¶ 25, 125 N.E.3d 487 (holding that the absence of information regarding an investigation into an insanity defense does not demonstrate a failure to investigate or the possibility of facts precluding that defense). Fourth, we presume that counsel's actions and representations in the trial court were ethically sound. See *People v. Wood*, 2014 IL App (1st) 121408, ¶ 77, 16 N.E.3d 253 ("[A]n attorney must sign every pleading, motion or other document entered on behalf of a party he is representing, and his signature constitutes a certification that, to the best of his knowledge, information and belief formed after reasonable inquiry, it is well grounded in fact and is warranted by existing law.") (citing Ill. S. Ct. R. 137(a) (eff. July 1, 2013)); see also Ill. R. Prof'l Conduct R. 3.1 (eff. Jan. 1, 2010).

¶ 52        In the present case, none of these presumptions are refuted by the record. The parties agree that defendant struggled with mental illness and was not fit to stand trial at the time of the discharge hearing—facts certainly known to defense counsel, considering counsel's (1) motion for a fitness evaluation based on his doubt of defendant's fitness and (2) statements at the discharge hearing about "DHS reports" and that he had "spoke[n] to the doctor [who] was treating [defendant]." Indeed, in cases involving a discharge hearing, counsel will nearly always be well acquainted with defendant's mental condition and be privy to facts, both on and off the

record, that will influence counsel's investigative decisions and trial strategy.

¶ 53        The mere fact that defense counsel did not request a sanity evaluation or state on the record that—to quote from defendant's reply brief—he "purposefully rejected an insanity defense in favor of some other strategy" is not evidence that he was unaware of the potential defense. See *People v. Ressa*, 2019 IL App (2d) 170439, ¶ 25, 125 N.E.3d 487 ("[T]he record here does not reveal whether counsel investigated the issue. It is possible that counsel did investigate and received information that would not support an insanity defense."). And we reject the notion that counsel must preemptively make statements on the record showing which trial strategies he considered and rejected to avoid later claims of ineffective assistance. That suggestion flips the standard of review on its head and ignores the presumption of reasonable performance of trial counsel (*supra* ¶ 50).

¶ 54        Although the conspicuous absence of a sanity evaluation *could* support an argument that counsel (1) did not investigate an insanity defense or (2) misunderstood the law regarding that defense, the evaluation's absence *could* also show that counsel knew information from outside the record precluding the defense. See *id.* Accordingly, we can determine whether counsel performed deficiently only by examining the evidence *actually present* in the record that refutes the presumption that counsel acted reasonably.

¶ 55        Defendant compares this case to *People v. Young*, 220 Ill. App. 3d 98, 581 N.E.2d 371 (1991), *People v. Manns*, 373 Ill. App. 3d 232, 869 N.E.2d 437 (2007), and *People v. Penn*, 2022 IL App (4th) 210084-U, all of which examined defense counsel's performance during discharge proceedings and concluded counsel was ineffective for failing to present an insanity defense. However, those cases are distinguishable from the present case.

¶ 56        In *Young*, the appellate court held that defense counsel was ineffective because

counsel pursued a defense that was unsound as a matter of law instead of an insanity defense. *Young*, 220 Ill. App. 3d at 107. The court explained that in pursuit of the meritless defense, counsel did not call witnesses or subject the State's case to meaningful adversarial testing, effectively conceding the defendant's guilt. *Id.* Further, the court held that an insanity defense was strongly supported by the record, considering the defendant's medical history, psychological evaluations following the offense, and conduct in committing the offense. *Id.* at 108. In that case, the defendant had been accused of holding his ex-wife and son at gunpoint and demanding that his ex-wife confess in writing to killing the defendant's mother, who was in fact alive. *Id.* at 108 ("[I]t is hard to imagine why else defendant would have coerced his former wife at gunpoint into signing a 'confession' that she killed someone who was not dead."). In addition, multiple experts "unanimously concluded that he was suffering from paranoia and delusional thinking," with one expert opining that the defendant's alleged conduct was "more in line with a person suffering persecutory delusions than a rational man." *Id.*

¶ 57   In *Manns*, the defendant was charged with aggravated robbery for taking $100 from a bank teller at gunpoint. *Manns*, 373 Ill. App. 3d at 233. During his arrest and in several psychological evaluations thereafter, the defendant indicated that he believed "he owned the bank in question or it had been stolen from him, and he was, therefore, entitled to withdraw money from it." *Id.* at 241. Despite this evidence, counsel did not pursue an insanity defense, instead choosing to cross-examine only the teller to verify that the defendant said (1) he wanted $100 and (2) the bank had been taken from him. *Id.* On appeal, this court held that counsel was ineffective for failing to raise an insanity defense because "the accounts of defendant's behavior at the time of the offense, statements he made in court, and his fitness evaluations demonstrate he was delusional at the time of the offense and lend support to the defense he was unable to appreciate the criminality

of his conduct." *Id.* at 240.

¶ 58        In *Penn*, defense counsel did not raise an insanity defense or introduce evidence thereof until the closing arguments of the discharge hearing. *Penn*, 2022 IL App (4th) 210084-U, ¶ 47. When counsel raised the defense, the State objected and asked the argument be stricken from the record, contending that no evidence had been presented to support that defense. *Id.* ¶ 23. Counsel explained to the trial court that "she did not raise the affirmative defense of insanity earlier because she did not have the evidence beforehand." *Id.* ¶ 47 Ultimately, the trial court found the defendant "not not guilty." *Id.* ¶ 23.

¶ 59        On appeal in *Penn*, this court held that counsel was ineffective because the record contained "ample evidence to support a request for a sanity evaluation and an investigation into the viability of an insanity defense." *Id.* ¶ 48. This court posited that to support an insanity defense, defense counsel could have (1) called the expert who evaluated the defendant's fitness to testify about his observations and his report, (2) cross-examined the officers further on their prior contacts with the defendant and their observations about the defendant's mental condition during the offense, and (3) requested and obtained a sanity evaluation of the defendant to present at the discharge hearing. *Id.* ¶¶ 49-50.

¶ 60        Here, unlike in those cases, the record does not show that (1) defense counsel pursued a defense that was unsound as a matter of law (see *Young*, 220 Ill. App. 3d at 107 ("Such cross-examination and argument as he made, moreover, were almost entirely directed toward his theory that a conviction of armed violence would be an improper double enhancement of an intimidation conviction. This theory is unsound as a matter of law.")); (2) counsel believed an insanity defense to be viable but failed to adequately present the defense (see *Penn*, 2022 IL App (4th) 210084-U, ¶ 48 (failing to introduce evidence of insanity or raise the defense before closing

- 14 -

arguments)); (3) an expert opined that defendant's conduct at the time of the offense indicated she lacked substantial capacity to appreciate the criminality of her conduct (see *Young*, 220 Ill. App. 3d at 108 (stating multiple experts "unanimously concluded that he was suffering from paranoia and delusional thinking," with one expert opining that the defendant's alleged conduct was "more in line with a person suffering persecutory delusions than a rational man")), or (4) defendant's conduct in committing the offense and her conduct and statements surrounding the offense were so bizarre as to compel reasonable counsel to request a sanity evaluation (see *id.* ("[I]t is hard to imagine why else defendant would have coerced his former wife at gunpoint into signing a 'confession' that she killed someone who was not dead."); *Manns*, 373 Ill. App. 3d at 240 ("[T]he accounts of defendant's behavior at the time of the offense, statements he made in court, and his fitness evaluations demonstrate he was delusional at the time of the offense and lend support to the defense he was unable to appreciate the criminality of his conduct.")).

¶ 61        Much of the evidence that defendant points to in the record that she alleges shows defense counsel should have raised the insanity defense either undermines defendant's argument or is ambiguous at best. For instance, defendant points out that Dr. Eckert believed she had memory problems and "exhibited evidence of delusional thought patterns especially concerning the current charges and the events leading to her arrest." Based thereon, she argues that her disorganized thoughts and delusions about the events giving rise to the alleged charges suggest she was not able to appreciate the criminality of her conduct. However, that is not necessarily true. If defendant is an unreliable historian, then what stock should counsel have put into her explanations for what occurred that day? Given the fact that the IDHS report stated that defendant's memory was intact when she was not symptomatic, the evidence relied on by defendant actually supports the conclusion that counsel determined he could not raise an insanity defense.

¶ 62     The test for insanity is not whether defendant could remember events accurately or tell the truth but, instead, "if at the time of such conduct, as a result of mental disease or mental defect, [s]he lacks substantial capacity to appreciate the criminality of [her] conduct." 720 ILCS 5/6-2(a) (West 2020). "A defendant's unusual behavior or bizarre or delusional statements do not compel a finding of insanity, and a defendant may suffer from a mental illness without being legally insane." *People v. Dwight*, 368 Ill. App. 3d 873, 880, 859 N.E.2d 189, 195 (2006). Relevant considerations in an insanity determination include (1) the testimony of lay witnesses who observed the defendant around the time of the crime, (2) whether the defendant planned the crime, and (3) whether the defendant attempted to conceal the crime. *People v. Frank-McCarron*, 403 Ill. App. 3d 383, 396, 934 N.E.2d 76, 88 (2010). Evidence that a defendant is fit for trial is irrelevant to a determination of whether the defendant was insane at time of the crime. *People v. Scott*, 148 Ill. 2d 479, 531, 594 N.E.2d 217, 238 (1992).

¶ 63     Notwithstanding defendant's alleged memory problems months after her arrest, her memory of unlawfully making at least one purchase with the credit card appeared to be intact, based on her following statement at the end of the discharge hearing:

> "[T]his was a big misunderstanding because I picked—I had—I found the wallet, right, and I wasn't going to use it, I went into a—up to the Dollar Tree—
>
> * * *
>
> It was a mistake and a misunderstanding because I didn't want to go through the line. The woman had me go through the line because she didn't know what to do to get a receipt or anything else in order to do her job. But she said she hadn't taken her pills. She said she was sorry about it and that's all."

¶ 64     The statement that she "wasn't going to use it" strongly implies that she understood

the wrongfulness of her actions, as does her handing over the stolen wallet with little prompting by a police officer. See *People v. Fenderson*, 157 Ill. App. 3d 537, 551, 510 N.E.2d 479, 488 (1987) (stating evidence that defendant understood the unlawfulness of conduct defeats a claim of insanity).

¶ 65 Moreover, her explanations—or excuses—for her conduct actually hurt her argument on appeal. At various times, she said (1) her medications were to blame for her actions, (2) she was "mozzed" out, or (3) she had a disability attack. But the note by defendant's psychiatrist, which Dr. Eckert reviewed, indicated that the medication she was on would not cause her to "steal a wallet and make unauthorized charges."

¶ 66 Defendant also told Eckert that she had had "legal misunderstandings" in the past and blamed her medical condition as the cause. However, defendant's caseworker, Follis, reported to Eckert that defendant had previously "stolen from cards" and, despite on some occasions claiming total innocence because she "blacked out," she "in the past admitted that she knew exactly what her offense was and knew that what she had done was 'wrong.' " These "misunderstandings" and excuses show a pattern of defendant avoiding blame for her illegal acts, which imply she appreciated the criminality of her conduct.

¶ 67 Defendant argues that a guilty person would have attempted to conceal the offense by (1) not using the credit card in front of witnesses and in full view of cameras, (2) hiding the purchased items and wallet, (3) changing clothes, or (4) not handing police officers the wallet when prompted. Further, she notes that she made small purchases in an attempt to get cash back at multiple locations—conduct she paints as bizarre because "there was no way for her to do so." However, defendant's ignorance of the procedures to obtain cash from a convenience store, her absent-mindedness, and her history of mental health issues fall far short of requiring counsel to

pursue an insanity defense.

¶ 68    Indeed, all the information defendant refers to on appeal—and presumably more—was known to defense counsel, and we will not hold counsel's performance deficient based on speculation regarding what he did not know.

¶ 69    In addition, underlying defendant's argument on appeal is the "stakes raising" contention that because defendant was clearly guilty of the crime, any defense other than an insanity defense was doomed to fail. Because of that alleged inevitability, defendant argues, counsel should have raised the insanity defense as her only hope of acquittal. Defendant contends that by failing to raise the insanity defense, along with counsel's decisions not to give opening and closing arguments or introduce evidence, counsel's representation at the discharge hearing was tantamount to a breakdown of the adversarial process and a concession of defendant's guilt.

¶ 70    We disagree. A possibly meritorious defense is not synonymous with a defense meritorious in fact. During appellate review of ineffective assistance of counsel claims, this court operates under the presumption that counsel was not ineffective, and it is the appellant's burden to refute it. See *Strickland*, 466 U.S. at 690 ("[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.").

¶ 71    At a discharge hearing, the burden is on the State to prove the defendant's guilt beyond a reasonable doubt. *People v. Mayo*, 2017 IL App (2d) 150390, ¶ 3, 79 N.E.3d 359. Counsel's decision to hold the State to that burden is not inherently unsound trial strategy, nor is counsel's decision not to present or argue any specific defense. See *Young*, 220 Ill. App. 3d at 108 ("Had there been no *bona fide* defense, defense counsel would not have been ineffective for not raising one".).

¶ 72        We can understand how it is appealing for a defendant to believe that in the absence of any realistically strong defense, the burden is on her trial counsel to raise any and all possible defenses, however weak and unpersuasive they may be. However, that is not the law. The evidence supporting an insanity defense does not become more persuasive simply because the State's evidence of guilt appears overwhelming.

¶ 73        Given that it was defendant's burden to show by clear and convincing evidence that she was not guilty by reason of insanity, defense counsel cannot be faulted for failing to "pursue a defense for which he lacked an adequate factual and legal basis." *Wood*, 2014 IL App (1st) 121408, ¶ 77; 720 ILCS 5/6-2(e) (West 2020).

¶ 74                              III. CONCLUSION

¶ 75        For the reasons stated, we affirm the trial court's judgment.

¶ 76        Affirmed.